## ALLEGHANY CORP. et al. v. JAMES FOUNDATION OF NEW YORK, Inc.

United States District Court
S. D. New York.
Sept. 22, 1953.

See, also, D.C., 12 F.R.D. 434.

White & Case, New York City, Robert J. Bulkley, Cleveland, Ohio, Arthur L. Corbin, New Haven, Conn., Joseph M. Hartfield, J. Adam Murphy, Haliburton Fales, II, Melvin L. Milligan, II, New York City, of counsel, for plaintiffs.

Milbank, Tweed, Hope & Hadley, New York City, A. Donald MacKinnon, William E. Jackson, New York City, of counsel, for defendant.

RYAN, District Judge.

This suit which was tried to the court seeks recovery upon two alternative causes of action in which the plaintiffs assert claims predicated on contracts alleged to have been made on February 5, 1951 or on February 8, 1951, for the sale by defendant of 153,165 shares of the common stock and 55,727 shares of the five percent cumulative preferred stock of the Western Pacific Railroad Company.[1]

Plaintiffs claim these blocks of stock were unique in character because they represented voting control of the railroad and could not be purchased in the market at the time of the alleged breach of the contract of sale. Plaintiffs pray for specific performance against payment of the total purchase price; in the event this equitable relief is denied, they seek money damages. Although the complaint also asks for injunctive relief restraining the defendant from selling, transferring, pledging or otherwise disposing of the stock during the pendency of the suit, no application for such relief was made.

Basic to both causes of action is a document (Pltfs' Ex. 4, which is annexed hereto as Appendix A), dated January 29, 1951, expressing the terms of an agreement made that day between defendant James and two individuals who are not parties to this suit—William Wyer and William H. Pflugfelder. It is under authority of this writing that plaintiffs contend an offer to sell was made, and by this paper, too, and by the subsequent acts of defendant James, plaintiffs contend that Wyer and Pflugfelder and those later associated with them, were constituted agents of defendant James, not only to extend the offer but also to receive acceptance of it.

Defendant, by its answer, admitting the agreement with Wyer and Pflugfelder of January 29, 1951 and ownership during February 1951 of the stock in suit, denies in substance the making of the contracts alleged, due performance by plaintiffs and default on its part.

1. The following abbreviations, at times, are used herein:
*Alleghany*—Alleghany Corporation
*C&O*—Chesapeake & Ohio Railway Company
*Hanover Bank*—Central Hanover Bank & Trust Company
*IDS*—Investors Diversified Services, Inc.
*ISA*—Investors Syndicate of America, Inc.
*James*—James Foundation of New York, Inc.
*S&Co.*—J. & W. Seligman & Co.
*Selected*—Selected Industries, Inc.
*Tri-Continental*—Tri-Continental Corporation
*Union*—Union Securities Corporation
*Western*—The Western Pacific Railroad Company
*W&P*—William Wyer and William Pflugfelder

Defendant also pleads three separate and complete defenses—the statute of frauds; that the contract of sale, if found to have been made was illegal and unenforceable by plaintiffs because consent and approval of the Interstate Commerce Commission had not been secured; and that Wyer and Pflugfelder did not in fact produce buyers ready, able and willing to perform as required by the writing of January 29, 1951.

With the issues thus framed[2] this suit proceeded to trial. After consideration of the testimony and exhibits I make the following:

### Findings of Fact

1. That plaintiff, Alleghany Corporation is a Maryland corporation and at all times material, Robert R. Young was the Chairman of Board of Directors of that corporation;

2. That plaintiffs, Investors Syndicate of America, Inc. and Investors Diversified Services, Inc. are Minnesota corporations;

3. That Union Securities Corporation and Tri-Continental Corporation are Maryland corporations; that Selected Industries, Inc. is a Delaware corporation;

4. That defendant, James Foundation of New York, Inc., is a New York charitable corporation, and at all times material, Robert E. Coulson, George L. Burr and J. K. Olyphant, Jr. were Trustees and Directors of this corporation;

5. That William Wyer is a consulting engineer with special training and experience in the railroad field; William Pflugfelder, is a stock broker and member of the New York Stock Exchange, and has in the past been active in dealing with railroad securities.

6. On January 29, 1951 James made an agreement in writing with W&P which was received in evidence as plaintiffs' Exhibit 4 (annexed hereto as Appendix A). At the time of the making of the agreement it was the purpose of James to employ W&P, upon the terms and conditions therein expressed to act as brokers to seek out and produce buyers, ready, able and willing to enter into the written contract, in form as annexed to the agreement and on the stated terms, to purchase and buy the James holdings in Western of 55,727 shares of preferred stock and 153,165 shares of common stock. W&P understood that this was the purpose of James and accepted, read and interpreted the agreement of January 29, 1951 as drawn and intended to accomplish only this.

7. Thereafter, Pflugfelder, through James G. Reardon, manager of the order department of J. & W. Seligman & Company, sought and obtained the assistance of Henry Breck in finding purchasers for the stock held by James in Western on the terms set forth in the agreement of January 29, 1951. At the time a copy of this agreement was shown to Breck by Pflugfelder; Breck read it and was advised of its contents. Breck is one of the partners of J. & W. Seligman & Company, stockbrokers, with partner membership in the New York Stock Exchange. On January 30, 1951, Breck agreed with Pflugfelder to associate his firm of S&Co. with W&P and to work with them under the agreement. It was then agreed that S&Co. were to receive one-third of all monies paid by James to W&P under the agreement. Pflugfelder furnished Breck with a counterpart copy of the W&P agreement with James.

2. The issues, which are stated in paragraph 8(a) of the pre-trial order, may be summarized as follows:
  1. Whether contracts were entered into between the alleged purchasers and defendant.
  2. If there were such contracts, (a) whether they violated Section 85 of the New York Personal Property Law, McK. Consol.Laws, c. 41, (b) whether they were invalid for lack of prior approval or authorization by the Interstate Commerce Commission, and (c) whether there was a breach thereof.
  3. If there was a breach thereof, whether plaintiffs are entitled to specific performance or damages, and if damages, the proper measure thereof; and
  4. Whether the alleged assignments to plaintiff Alleghany by Union Securities, Tri-Continental, and Selected Industries are valid and enforceable.

8. S&Co. managed the investment portfolios of Union, Selected and Tri-Continental; Breck was a vice-president and director of each of these companies.

9. The Trustees of James did not know that Pflugfelder had approached Breck and made an agreement with him; Pflugfelder had gone to Breck without suggestion from James.

10. Following the agreement of Breck with W&P and on February 1, 1951 Breck sought help and assistance of David Baird, a partner of David Baird & Company, a member firm on the New York Stock Exchange. Breck knew that Baird had business contacts with Robert R. Young. Baird's firm had business offices adjoining those of S&Co. and he had previously joined with them in the sale of other large blocks of stock. Breck then told Baird only that there had been offered to him a substantial block of preferred and common stock of an attractive situation; he stated that at the time he could not disclose the name or price of the stock or the identity of the owner. Baird promised to be available for a few days and to be subject to call from Breck, that he might work on securing buyers for the stock. It was on the next day, February 2, 1951, that Breck told Baird that S&Co. had the James stockholdings in Western, firm[3] in hand and exclusive until February 14 to find a buyer on an all or none basis, but that he could not give Baird authority at the time to try to locate a buyer definitely because Tri-Continental was considering a possible purchase. Baird mentioned that Robert R. Young might be interested in buying and said that he would await further word from Breck.

11. During the forenoon of February 3, 1951, Tri-Continental and Selected, by corporate act duly authorized the purchase of 7500 shares of common and 7500 shares of preferred stock of Western.

12. It was after this that Breck again saw Baird and again told him that he had the James Western stock firm in hand and exclusive on the terms stated in the agreement of January 29, 1951, and that Tri-Continental had voted to take 7500 shares each of the preferred and common stock. Breck also told Baird that the stock could only be sold for investment purposes and not for distribution, and that the purchase would have to be made at the price on the last previous closing of trading on the Stock Exchange for each class of Western Stock and not below a minimum stated price. He also advised Baird that S&Co. would participate in the commission on a sale by S&Co. to the extent of one-third. Baird still had not seen a copy of the agreement between James and W&P, but Breck told him that he expected to meet the James trustees that afternoon to propose and discuss certain changes or modifications in the agreement. It was agreed that Baird was to share equally in any commissions earned by and paid to S&Co.; that W&P were to receive on a sale a commission of approximately $300,000. and that if the purchase price were higher than the contract minimum W&P were to receive additional compensation.

13. When Breck had first been shown the agreement of January 29, 1951 by Pflugfelder Breck remarked that it would be difficult to perform particularly on account of the fluctuating price (described in the agreement as the closing price on the Stock Exchange the day previous to the signing of the agreement of sale), and the limitations on the submission of the stock for purchase to not more than twenty persons in a transaction which

---

3. A firm offer made by a stockbroker means that the stockbroker has a firm commitment from the owner to himself by which he can sell the stock without fear of a prior sale by the owner and can offer the stock for sale to a third person for a period of time during which the third person may say yes or no. The firm offer by the broker to the third person also means that the broker until the answer of the third person is received will not sell the stock to anyone else.

involved over $13,000,000. Breck felt that finding a buyer for the stock on the terms specified was complicated and difficult—not an ordinary transaction, and that the commissions were higher than for an ordinary transaction.

14. Breck on February 3, 1951 requested Pflugfelder to arrange a meeting with the James trustees so that he might propose changes in the agreement of January 29, 1951. Breck had known Burr, one of the trustees for twenty years, and Olyphant, another trustee, for ten years. Wyer discussed the matter with Coulson, the third trustee, and Wyer told Coulson that S&Co. were interested in the James stock and that they had suggestions to make for modification of the terms of the agreement. Wyer also told him that S&Co. controlled two of the investment trusts which Wyer had in mind as a part of a group of purchasers and were in touch with other investments trusts and insurance companies. By appointment, thus made, Wyer, Pflugfelder, Breck and Reardon went to the offices of James on the afternoon of February 3, 1951 and there met the James trustees.

15. At this meeting, the James trustees were not told of the agreement W&P had made with S&Co. to share commissions which might be earned on a consummated sale, nor were they advised that S&Co. had further associated themselves with Baird and agreed to divide their commissions with him. Breck did tell the James trustees that he was speaking for S&Co., Union and Tri-Continental, and that he had discussed the matter with the Seligman investment trusts and with Union.

16. Breck was told by Coulson, one of the James trustees, that James did not recognize S&Co. in the transaction and that James would deal only with W&P. Breck's suggestions as to modifications of the agreement with W&P of January 29, 1951 were, however, listened to by the Trustees, but they did not discuss these proposed changes with him. After Breck had made his suggestions, he was again told by another of the trustees, Olyphant, that their agreement was only with W&P; that the trustees would discuss the matter with them alone, and that the trustees did not know Breck in the transaction. The trustees requested Breck to leave with Reardon, S&Co.'s employee, and they went out. No mention was made by the trustees or by W&P that there were any oral instructions or limitations with respect to the agreement of January 29, 1951. W&P remained with the trustees for further talk.

17. The trustees then told W&P that they would not change the agreement of January 29, 1951 in any manner, but that they would receive, consider and accept or reject any propositions outside of and separate and apart from the agreement which W&P might submit.

18. After this meeting, Breck, Reardon and W&P adjourned to a nearby social, private club. There, Pflugfelder told Breck that the trustees had refused to modify the agreement they had made with W&P but that offers outside of its terms might be submitted from prospective purchasers. In response to inquiry from Breck as to whether that opened the door to Robert R. Young as a possible purchaser, Wyer told Breck that Young could not be presented as a purchaser under the agreement, but that, perhaps, an offer from Young might be tendered the trustees outside the agreement. Breck did not then tell W&P that he had already discussed Young with Baird as one who might be interested but both W&P were informed by Breck that he regarded Alleghany as the most likely buyer and that he would attempt to contact Young that evening. Neither Wyer nor Pflugfelder made any objection to this.

19. In fact, on the morning of February 3, 1951 and prior to Breck's meeting with the trustees, Baird had telephoned from New York to Young who was in Florida and told him that he and Breck had the James Western Stock firm in hand and exclusive until February 14, that it was an all or none deal, that the price until 3 p. m. Monday, February 5, 1951 would be the previous day's closing —(that is, Saturday, February 3, 1951

closing prices of 53½ for the common and 92¾ for the preferred)—that the stock was being first offered to Tri-Continental and that he hoped shortly for clearance to offer the stock firm to Young. Baird in his conversation with Young did not mention the names of Wyer or Pflugfelder, and did not disclose further particulars of the agreement, nor did he tell Young of the requirement in the agreement of written contracts of sale. Young expressed to Baird his interest in the stock and said that he would discuss the matter by telephone with members of the executive committee of Alleghany.

20. Baird had a general understanding with Young that Baird would work on various stock and investment matters of interest to the companies with which Young was associated in return for such compensation that could be properly accorded, as determined by Young. During the conversation between Baird and Young on February 3, 1951, Young advised Baird that Blyth & Co. had tried to interest him in the Western preferred previously and that he, Young, did not want any trouble with Blyth over commissions, and that he would not pay any commissions to Baird. Young received assurances from Baird that the commissions would be paid by James. Baird at the time of this talk had not been informed that when Breck first spoke to Pflugfelder on January 30, 1951, Pflugfelder had told Breck that it was better not to approach IDS or ISA on the preferred stock because Blyth & Co. or Glore, Forgan & Co. might claim a commission. Breck had then replied to Pflugfelder that it might be necessary to approach such informed buyers and that they could then consider whether a commission might be owed to these brokers.

21. After the meeting with the James trustees and on the evening of February 3, 1951, Breck communicated with Baird and told him to offer the James stock to Young. Breck did not tell Baird of the details of what had happened at the meeting with the trustees or at his subsequent talk with Wyer and Pflugfelder at the club.

22. On the next day, February 4, 1951, Baird advised Young that he had the necessary clearance to offer him firm the James Western stock less the amount that Tri-Continental and Selected had decided to purchase and that there would be no difficulty in disposing of the balance of the preferred stock as Union would take it. He told Young of the minimum price of which he had been informed by Breck, which was the same as that set forth in the James agreement of January 29, 1951 with W&P; that the stock consisted of 153,165 shares of common and 55,727 shares of preferred of Western, and that stock was required to be bought for investment and not distribution, on an all or none basis, ex-dividends payable February 15, 1951. Young told Baird that he felt confident he would have a definite decision before 10 a. m. the following day.

23. Again, early the following day, Monday, February 5, 1951, Baird phoned Young pointing out to him that a decision by Young given in time for delivery by 3 o'clock that afternoon would be protected at the previous Saturday's market price. Young told Baird that he would advise Baird before lunch; still nothing was said by Baird regarding the execution of written contracts.

24. During his conversations with Baird, Young advised him that he was going to call his fellow directors of Alleghany and his associates to recommend the purchase of James Western stock, but that he would have to be absolutely certain that Baird had the stock exclusive and firm until February 14, and that if assent to the purchase was made then it would be at Saturday's closing price. Young also told Baird that Alleghany would have to make sales of other securities to provide the funds necessary and that he did not want Alleghany to be in the position of "holding the bag". Baird although he had not seen the agreement of January 29, 1951, relying on what Breck had told him, did give Young such absolute assurances.

25. Around noon on February 5, 1951, Young telephoned Baird that Al-

leghany would buy all the James Western common stock on the terms Baird had offered it. Young asked Baird to contact Robert W. Purcell, vice-president and a director of Alleghany, and Galen Van Meter, both directors of IDS and ISA, concerning the preferred stock. Baird, at this time, advised Young that Tri-Continental was not interested in the entire block of common stock.

26. After this talk with Young, Baird told Breck of the interest of IDS and ISA in the preferred stock and Breck advised Baird that Union would take all of the preferred stock not bought by IDS and ISA.

27. Baird then contacted Purcell and Van Meter and by their action they agreed to purchase for IDS and ISA 5000 shares each of preferred.

28. Baird at about 2:15 p. m. February 5, 1951 again telephoned Young that the Investors group had purchased 10,-000 shares of the preferred stock and that the balance had been purchased by Tri-Continental and Union Securities; Breck also came on the wire; he, too, spoke to Young and congratulated him;

the telephone conversation ended about 2:35 p. m.[4]

29. The following corporations, by duly authorized corporate act of each, on February 5, 1951 orally did accept an oral offer of sale, in amounts and at prices listed, of stock of Western made to them by Breck himself or through Baird, and did on that day agree to purchase as follows: [5]

| | |
|---|---:|
| Alleghany Corporation— 153,165 shares of the Common Stock at $53.-50 per share | $ 8,194,327.50 |
| Investors Diversified Services, Inc.—5,000 Shares of Preferred Stock at $92.75 per share | 463,750.00 |
| Investors Syndicate of America, Inc.—5,000 shares of the Preferred Stock at $92.75 per share | 463,750.00 |
| Union Securities Corporation—35,727 shares of the Preferred Stock at $92.75 per share | 3,313,679.25 |

4. It is on the oral transaction with Baird and Breck that plaintiffs in the first cause of action allege that a contract was made on February 5, 1951. It is their contention that Plaintiffs' Exhibit 4, the agreement of January 29, 1951, was an offer, irrevocable by its terms until February 14, 1951; that W&P and those associated with them (Breck and Baird) were by this same writing not only empowered to extend the offer but authorized to receive acceptance of the offer on behalf of defendant James. It

is upon this they urge that the James' Western stock was then purchased. It is conceded that no written contracts of sale were executed by any of the plaintiffs, or their assignors, or tendered to Wyer, Pflugfelder or James on that day (Pre-trial order, para. 3). But it is plaintiffs' position on this first cause of action pleaded that the written contract provided to be signed by Exhibit 4 was intended to be only a memorial of a prior acceptance of the offer.

5. By answer to interrogatories propounded plaintiffs allege the offers to the corporations were made as follows:

| By | To | Date |
|---|---|---|
| Baird & Co., acting by David Baird | Alleghany, represented by Robert R. Young | On or about February 3, 1951 |
| Baird & Co., acting by David Baird | IDS and ISA, each represented by Robert W. Purcell and Galen Van Meter | On February 5, 1951. |
| J. & W. Seligman & Co., acting by Henry Breck | Union Securities, Tri-Continental, and Selected Industries, represented by certain of their directors, including Henry Breck | On or about February 3, 1951 |

Tri-Continental Corpora-
tion—5,000 shares of
the Preferred Stock
at $92.75 per share ..     463,750.00
Selected Industries, Inc.
—5,000 shares of the
Preferred Stock at
$92.75 per share......     463,750.00
                $13,363,006.75[6]

30. Each of the corporations was financially able, ready and willing to perform and consummate the agreement to purchase so made by each.

31. Alleghany, in order to put itself in a cash position to pay for the Western common, found it necessary to make portfolio changes. Alleghany sold 100,-000 shares of Chesapeake & Ohio R.R. Company common stock at the Saturday, February 3, 1951, closing price, and so made $3,582,000. available to itself for the purchase by it of the James Western stock.

32. Specifically, it is found

a. that no written contracts were executed by any of the corporations listed as purchasers in paragraph 29 hereof, or tendered to Wyer, Pflugfelder or the defendant on February 5, 1951.

b. that none of the corporations or officers or agents of them had any direct dealings or conversations with defendant James, its trustees, or with Wyer or Pflugfelder concerning the purchases above listed.

c. that the sole dealings of Alleghany, IDS and ISA were with Baird and the sole dealings of Tri-Continental, Selected and Union were with Breck. None of these corporations made inquiry of James as to the authority of Baird or

Breck to offer the James Western stock or to bind James.

33. Prior to 3 p. m. on February 5, 1951, Breck advised Pflugfelder that he had a group who would take the James stock at $53.50 per share of common and at $92.75 per share of preferred; he gave Pflugfelder the names and amounts but he did not include IDS or ISA and he listed Union for 45,727 shares of preferred. Pflugfelder wrote a memorandum of what Breck listed and Wyer copied this in a separate writing.

34. Wyer, following this and prior to 3 p. m., advised Coulson, one of the James trustees, of what Breck had reported. Wyer stated that Alleghany and others desired to submit bids for the James stock, that he was presenting them outside of the agreement and inquired whether they were acceptable to the trustees. Wyer did not mention the names of IDS or of ISA. He told Coulson that he was submitting these bids for the James stock outside of the agreement of January 29, 1951, and subject to acceptance or rejection by James. Coulson. conferred by phone with Burr and Olyphant, and then told Wyer that Alleghany could not be produced as a purchaser under the agreement and that James would not accept any offer from Alleghany outside the agreement without prior approval from the Interstate Commerce Commission. Wyer reported this conversation to Breck, who in turn relayed it to Baird.

35. The following day, February 6, 1951, Baird informed Young of what Breck had told him and Young replied that he had purchased the stock, that Baird and Breck had offered the stock

---

**6.** In fact the corporate act of Union authorized the purchase of 35,757 shares of Western preferred and not of 35,727. The defendant, James, points out that concededly it owned at the time but 55,-727 shares of preferred and that the purchase by Union of 35,757 shares of preferred and by the other four of 5,000 shares of preferred each totals 55,757 shares, or 30 more than defendant owned. This amount is trivial and not a variance in a transaction of this magnitude.

Likewise it appears unimportant and of no weight that at about 2:40 p. m. on February 5, 1951 S&Co. requested and received permission of the N. Y. Stock Exchange to sell off-the-board 153,165 shares of Western Pacific Common at 53-½ to a holding company and 55,727 shares of Western Pacific Preferred at 92-¾, of which they represented that 7,500 shares were being sold to two investment companies and 48,227 shares to Union.

firm, and that he was going to hold everyone responsible to deliver. Thereafter, all involved sought counsel and there followed a series of guarded and self-serving communications, each one endeavoring to record his respective position and version of what had occurred; carefully planned and deliberate actions were taken under advice, with a view to protecting and subsequently attempting to enforce whatever rights or obligations had been created.

36. Up to this time, Baird's only knowledge of what the agreement of the defendant with W&P contained had come to him through what Breck had told him. Baird, in his dealings with Young and Purcell relied entirely upon what Breck had said as to its contents, particularly as to Breck having the James Western stock firm and exclusive. Baird, himself, did not see a copy of the agreement until February 6, 1951.

37. It was only on that same day that Baird read over the telephone to Young a copy of the agreement. This was Young's first knowledge that the agreement was between James and W&P. Young did not actually see a copy of the agreement until later, on either February 7 or February 8, 1951.

38. Purcell did not know of the agreement until after 3 p. m. on February 5, 1951; he first saw a copy of it on February 7, 1951.

39. Young and Purcell knew that the negotiations they were conducting with Breck and Baird contemplated the purchase of an unusually large block of stock and not an everyday exchange transfer; they were on notice that Breck and Baird purported to be and represented themselves as agents and authorized brokers in a transaction different from the customary stock exchange transaction; neither Young nor Purcell

took the precaution of verifying the precise source, extent and nature of their authorization to act.

40. Although Wyer and Pflugfelder were advised that Breck, through Baird, was discussing the purchase of the James stock with Young, neither of them had any direct contact or negotiations with Young. At a meeting held on February 7, 1951 at the office of S&Co., Purcell called the attention of Breck and of Reed, one of the partners of S&Co., to the failure of compliance with the requirements for the signing of a written contract on February 5, 1951, and pointed out the advisability of doing this to support a claim that on that day there arose an obligation to deliver, binding on James. The attorney for S&Co. was also present at the meeting. It was then that contracts in form designated by the agreement of January 29, 1951 were prepared.

41. On February 8, 1951, the attorneys for Alleghany, IDS and ISA sent to S&Co. the signed documents, which in form were identical to "Exhibit B", which had been attached by the James Trustees to their agreement with W&P. These papers left blank the price to be paid for the stock they purported to purchase, but they were accompanied by letter which gave S&Co. due authority to fill in the blanks and to present them so completed to the James trustees at the Hanover Bank. These blanks were subsequently filled in with the closing prices on the New York Stock Exchange of February 7, 1951.

42. Like forms were on the same day signed and executed by Union, Selected and Tri-Continental with the closing prices of February 7, 1951.

43. These documents contained a recital of purchases in the amounts, prices and by the corporations as follows:[7]

7. It will be noted that the prices recited in these documents of February 8, 1951 are $55.375 per share of common and $93.00 per share of preferred (the closing prices on February 7); in this respect they differ from the prices at which the purchases are alleged in the

first cause of action to have been made, where the purchase price is alleged as $53.50 for the common (closing price of February 3, 1951) and $92.75 for the preferred (closing price of February 2, 1951).

Alleghany Corporation—
153,165 shares of the
Common Stock at $55.-
375 per share ......$ 8,481,511.88
Investors Diversified
Service, Inc.—5,000
shares of Preferred
Stock at $93.00 per
share .............. 465,000.00
Investors Syndicate of
America, Inc.—5,000
shares of the Pre-
ferred Stock at $93.-
00 per share ........ 465,000.00
Union Securities Corpo-
ration—35,727 shares·
of the Preferred Stock
at $93.00 per share .. 3,322,611.00
Tri-Continental Corpo-
ration—5,000 shares
of the Preferred Stock
at $93.00 per share .. 465,000.00
Selected Industries, Inc.
—5,000 shares of the
Preferred Stock at
$93.00 per share .... 465,000.00
$13,664,122.88

44. A partner of S&Co. accompanied by an attorney went to the Hanover Bank on February 8, 1951 before 3 p. m. taking with him the documents which had been signed as heretofore found; the James trustees had gathered there in meeting but the representatives of S&Co. were not admitted. Wyer was also present at the bank; Wyer was told by the representatives of S&Co. of the purpose of their visit; they showed him the documents and he examined them. Wyer sent in a note to Coulson, one of the trustees, advising him that the S&Co. representatives were present and were waiting with the "bids." A tender of the documents was made to and was refused by the Trustees.

45. Alleghany, IDS, ISA, Union, Selected and Tri-Continental had by their separate corporate acts duly authorized the purchase on February 8, 1951 of the stocks, in the amounts and at the prices specified in the documents so tendered, and each of these corporations was on that day ready, financially able and willing to complete and carry out such purchases.

46. Later, on March 8, 1951, and prior to the commencement of this action, Union, Selected and Tri-Continental assigned their claims against James arising out of the foregoing transactions and their rights with respect to the James Western stock to Alleghany corporation.

47. At the time of trial Alleghany corporation was ready and financially able to pay for the James Western common stock and for the James Western preferred stock listed hereinbefore as agreed to be purchased by Union, Tri-Continental and Selected.

48. After the tender of February 8, 1951 and on the same day, the plaintiffs' attorneys wrote to S&Co. (Pltfs' Ex. 1–A for id.) ; S&Co. wrote to W&P (Pltfs' Ex. 26 for id.) ; W&P replied to S&Co. (Pltfs' Ex.17–A for id.), and on February 9, 1951 S&Co. replied to plaintiffs' attorneys (Deft's Ex. 9 for id.).[8]

49. At the time the representatives of S&Co. appeared at the Hanover Bank on February 8, 1951 Wyer told them, with the approval of the trustee, Coulson, if not at his direction, that W&P were not in a position to present to the trustees the documents tendered and would not do so. Although the trustees refused to discuss the matter with representatives of S&Co., the trustees did further consult with W&P and decided to explore the legality under the Interstate Commerce Act of a sale of the James stock to Alleghany. That same evening, W&P met with the trustees and their counsel. It was decided that Wyer should go to see one of the Interstate Commerce Commissioners to informally

8. In the second cause of action, plaintiffs allege a contract of purchase and sale made on February 8, 1951; because of the factual findings made and the conclusions drawn from them, I give the incidents occurring after that date little import.

present the matter and endeavour to secure an unofficial reaction to a sale to Alleghany.

50. The next day, February 9, Wyer did go to Washington and there saw a member of the Commission. Wyer was advised, in substance, that should the matter be duly presented, the Commission would probably institute an investigation to determine whether the transfer involved a violation of Secs. 5(2) and (4) of the Act 49 U.S.C.A. § 5(2, 4). Wyer so reported to Coulson and the latter again told Wyer that James definitely would not consider any offer from Alleghany.

51. It was after this, and following an exchange of letters between the attorneys for S&Co. and plaintiffs' attorneys under date of February 13 and 14 (Deft's Ex. 43 for id. and Deft's Ex. 14 for id.), that S&Co. notified W&P at 2:30 p. m. on February 14, 1951 that the parties they had produced as purchasers would be present at the Hanover Bank to enter into contracts with James in the form prescribed by the agreement of January 29. S&Co. asked that the defendant be so notified (Pltfs' Ex. 19 for id.). Pflugfelder replied that Wyer and he were not in a position to present the bids to James under their agreement (Pltfs' Ex. 21–A for id.).

52. On the afternoon of February 14, 1951, a representative of S&Co. presented himself at the bank; he had with him forms of contracts executed by the same corporations which had made the tender of February 8, 1951; he left a letter of tender addressed to James and W&P on a table in a reception room in the bank; it did not contain the executed forms of contract (Pltfs' Ex. 23 for id.). Neither Wyer, Pflugfelder nor the trustees were present at the bank. The letter was later forwarded to and received by the trustees.[9]

53. The documents of February 8 and 14, 1951 (which plaintiffs urge were written evidence of acceptance, if not an acceptance itself, of an offer made in the agreement of January 29, 1951) were marked "cancelled" and "void" after they had been so tendered to the James trustees. This was not done with a purpose to release James of any claim which existed against it.[10]

54. The James holdings of Western common and preferred stock, both of which had voting rights, were the largest single blocks of such stock issued and outstanding; they amounted in the aggregate to approximately 28.7% of the total voting stock. The common stock of Western outstanding on February 5, and 8, 1951 was 408,255 shares and the preferred was 318,080 shares. This constituted a total of 726,335 voting shares. Next in amount to the James holdings of 153,165 shares of common stock, the largest single holdings were of 16,700; 15,788 and 10,000 shares. No other stockholder owned over 10,000 shares and only five held over 4,000 shares. Next in amount to its holding of 55,727 shares of preferred stock were 41,114 and 17,778; only three others held over 4,000 shares of preferred each.

55. The corporate records of the annual meetings of the stockholders of Western from 1945 through 1950 reveal that the voting power of the James holdings gave those empowered to cast it a strong voice in the management and with that went authority to act under the management proxies which totaled at

9. The prices contained in the documents dated February 14, 1951 (Pltfs' Ex. 23) were the closing prices on February 13, 1951—$54.625 for common and $93.00 for preferred stock. Here again the prices differ from those in the documents of February 8, 1951 which were $55.375 for common and $93.00 for preferred stock.

10. That this mutilation was accomplished prior to the execution of the assignments by Tri-Continental, Union and Selected is of no significance. It did not destroy the effectiveness of these documents, if they ever possessed any, as writings meeting the requirements of the applicable N. Y. Statute of Frauds (N. Y. Personal Property Law, Sec. 85; Transit Advertisers v. New York, N. H. & H. R. R., 2 Cir., 194 F.2d 907, certiorari denied, 344 U.S. 817, 73 S.Ct. 11.

least 30% of the outstanding stock. The James holdings have been the controlling stock of Western and ownership of it represented, in fact, effective control over the corporate affairs of Western.

56. Both the common and preferred stock of Western were traded in the New York and San Francisco exchanges.[11] The total sales of common in 1950 on these exchanges was 158,300 and 2,916 respectively and of preferred 34,200 and 526. An order to buy 153,165 shares of common or 35,727 shares of preferred would have had no ready market in February 1951; however, that amount of common might have been acquired by purchase in the market over a period of approximately six months at a price of $10. per share over the price when the buying was commenced. Similarly, the required amount of preferred might have been bought in a comparatively shorter period at a price of $15. per share above the price when accumulation was started. The orders to buy, in all probability, would have been met with offers increased in price but the continued purchases, sagaciously spaced, would have kept the prices within these limits.[12] The testimony of New York Stock Exchange specialists in Western common and preferred, which in this respect is accepted, was that between February 5, 1951 and June 30, 1951 they were unable to execute sell orders of these stocks at asking prices fractionally above the market because of the absence of purchasers, although there was a ready supply of Western preferred and common stock in smaller amounts than here involved.

57. At all times material Western and Alleghany were and continue to be common carriers by rail subject to Part I of the Interstate Commerce Act; and during the same period Alleghany was a common carrier possessed of control, within the meaning of Sec. 5 of the Act, of the Chesapeake & Ohio R.R., a common carrier by rail subject to Part I of the Act.[13]

58. In February, 1951 and at the date of trial, 153,165 shares of the common stock of Western alone carried sufficient voting power to affect strongly management policies where such shares were held as a single block by a person or persons desiring to exercise control. The purpose of Alleghany in offering to purchase the James Western common stock was to acquire control of Western; however, Alleghany did not apply for or receive the approval of the Interstate Commerce Commission of any purchase by Alleghany of the James Western common stock.

11. N. Y. Personal Property Law, § 148(3) provides that when there is an available market for the goods in question, the measure of damages in the absence of special circumstances showing proximate damages of a greater amount, "is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered * * *."

12. Expert testimony as to the actual value of Western was given by one eminently qualified to appraise an enterprise of this type. I have, however, entirely discounted this testimony, for time was not of the essence (even if a contract of sale be held to have been proved); and I have found that there was a market for the stock within a reasonable time after the alleged failure to deliver. Actual value of the stock is to be considered in assessing damages only when there is no market for it. If equitable relief be denied, the absence of a ready market on the date it is contended delivery was to have been made does not deprive defendant of its right to have damages, if any are found, admeasured by the market price prevalent within a reasonable time, when it is found that such market with fair certitude might have been anticipated within six months. In the light of the magnitude of the transaction, with the necessity of securing I. C. C. approval present, six months is in law a reasonable period. There was sufficient evidence for finding a normal and active market for the large amount of stock here involved, if acquired over a six month period.

13. See Pre-trial orders Exhibits B and C; Chesapeake & Ohio Railway Company Purchase, etc., 261 I.C.C. 239, 261–2 (1945) and order of June 5, 1945 thereunder.

59. Alleghany had notice, at least by April 23, 1951, that James was selling its Western stock and the plaintiff did not at any time apply for a preliminary injunction restraining James from selling this stock.

60. James does not now own either the common stock or the full amount of the preferred stock it owned on February 5 to 14, 1951, and James has never made delivery of any of Western common or preferred stock to plaintiffs or to any of the assignors of Alleghany.

61. Finally, I specifically find that the agreement of January 29, 1951 between James and W&P (Pltfs' Ex. 4, Appendix A attached hereto) was not modified by James and Wyer and Pflugfelder after its execution on January 29, 1951.

Upon the foregoing findings of fact, I make the following

Conclusions of Law

1. That this court has jurisdiction of the parties to this suit and of the subject matter here involved by reason of diversity of citizenship; that the law of the State of New York is to be applied in determining the rights of the parties herein.[14]

2. That the agreement of January 29, 1951 was a contract between James and W&P; it was an agreement providing for the special employment of W&P by James for a specified period for a particular purpose, at a fixed compensation and with definite limitations as to the authority of W&P.

3. That the agreement of January 29, 1951 concerned only the parties to it, that is, James and W&P; it was not made for the benefit of any third party, nor did it contain any statements, representations or covenants to any one not a signing party.

4. That the terms of the agreement of January 29, 1951 are clear, definite and unambiguous.

5. That the agreement of January 29, 1951 was not an offer by James, either publicly or privately made, to sell the Western stock owned by it; nor did the agreement appoint or authorize W&P to sell or make offers of the stock on behalf of James, or to receive as agents of James acceptances of any offer to sell the stock.

Wyer and Pflugfelder were employed by the agreement to go out and by restricted solicitation find and produce a party who was ready, willing and financially able to enter into a contract for the purchase of the entire block of James Western stock in form and upon precise terms set forth in the agreement.

6. That by the agreement of January 29, 1951 James undertook and agreed to be bound to prospective purchasers produced by W&P only after a written contract, in form specified, had been jointly signed by it and the prospective purchasers.

7. That at no time did James designate or appoint either W&P, S&Co., or Baird as its agents with authority to sell, offer for sale, or make contracts for the sale of its Western stock holdings.

8. That no contract of any nature was made by James with either the plaintiffs, the assignors of Alleghany or any of them for the sale to them of the James Western stock holdings; and specifically, that no such contract was made either on February 5, 1951 or February 8, 1951.

I have heretofore noted that basic to both of plaintiffs' claims is the agreement of January 29, 1951, for by it plaintiffs assert that the offer to sell was made by defendant, which was accepted by the plaintiffs; and that by it, plaintiffs argue too, Wyer and Pflugfelder (and Breck or S&Co. whom W&P associated with them) were constituted agents of the defendant not only to extend the offer but to receive acceptances of the offer from others. I am led then, first, to a consideration of this writing, and when I apply it as the measure of plaintiffs' claims, I find them without foundation or support.

14. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

My appraisal of this document of January 29, 1951 has not been made solely on a paragraph by paragraph analysis of the instrument. I have also read it as a whole and single document,[15] and from its entire contents I glean an expressed purpose entirely inconsistent with plaintiffs' contentions.

The agreement gives evidence that it was intended to describe specifically the terms of the employment of W&P and the extent of the authority it granted to them; it expressly states the limitations imposed. The paper is exactly what it purports to be, an agreement of special employment whereby W&P were engaged on an exclusive basis to go out and find in the market a buyer willing, qualified and acceptable to James to sign the stipulated form of contract of purchase.[16] It appears on its face to have been drawn to outline and define the powers and obligations of the parties who subscribed it only with respect to each other.

The provisions of the agreement which restrict the authority of W&P to produce purchasers for all, but not less than all of the James stock, I read as indicative of an intention that James was not to be bound until the specified formal contract was signed by both the purchasers produced by W&P and by James. The agreement repeatedly refers to a contemplated sale of "all the stock of Western Pacific Railroad Company held by James Foundation" (Para. 3). James also expressly limited those who would be acceptable to it as purchasers to "persons or institutions who would buy the stock for their own account for investment" and implicitly to such persons or institutions who were financially able to perform.

The commissions payable to W&P were deemed to have been earned upon "the actual transfer and payment for *all* such stock", and when the transaction was consummated "pursuant to said contracts of sale." There is evidenced throughout the entire agreement the purpose of James to retain to itself the sole power to contract and the right to refuse to contract with one or more purchasers unless it was satisfied that the purchasers acted "for their own account for investment" and that there would be performance by all of a group produced.

The form of contract provided for no deposit or partial payment of purchase price at the time of execution. Final closing on the contract with delivery of the stock and payment to James were to be "made on the third business day after the date" of the contract. It was not a transaction which involved immediate payment in full by a single purchaser or simultaneously by all of a group of purchasers at the time of the signing of the contract. The credit standing and financial position of a purchaser produced was therefore of prime importance to James.

The reservation by James to itself exclusively of this power to contract left to it the final choice of whom it would deal with, and this was its insurance that a group produced by W&P would buy "all but not less than all" of the stock owned. It afforded James some measure of protection that it would not be faced with a situation in which one, or part of a group, defaulted leaving James with some of the stock unsold. It was by the retention of the right to choose and decide with whom it would contract that James was able to satisfy itself as to the financial responsibility and other specified individual qualifications of those produced as prospective purchasers.

I have found that the parties to the agreement of January 29, 1951 accepted, read and interpreted it as containing a reservation to James of the right to contract; this understanding accords with the impression left after a fair and unbiased examination of its provisions is made. At no time did W&P interpret or represent the agreement as a grant of authority to them to offer as the agents

15. 1 Restatement of Contracts, § 235c; Atwater & Co. v. Panama R.R., 246 N.Y. 519, 159 N.E. 418.

16. Paragraph 5 of Appendix "A."

of James the blocks of stock, or to receive on behalf of James binding acceptance of an offer so made by them.

Neither the plaintiffs' nor Alleghany's assignors had any direct negotiations with the defendant; they dealt only with W&P. Plaintiffs, in support of their claims, urge that the document not only appointed W&P James' agents to receive acceptance of an offer the agreement contained, but also empowered W&P to delegate that authority to others. Thus, plaintiffs contend that Breck and Baird were in turn appointed by W&P and that James was to be bound by the acts of Breck and Baird.

A reasonable person seeing the agreement would neither read nor understand it as an offer addressed to anyone and everyone to whom it might be exhibited. It was just and only what it is stated to be—an agreement between W&P and James.[17]

The agreement employed W&P and them alone to find and produce purchasers. It did not by word empower W&P to delegate the authority granted them. The restriction that W&P were to approach no more than twenty prospects, indicates an intent on behalf of James to prevent performance of it to be delegated by W&P entirely to others. It speaks of a personal confidence in W&P; and at no time did James approve of a transfer of this to another.[18] In fact, it stands undisputed that throughout James refused to deal with Breck or S&Co. This, and the fact that eligible prospective purchasers were limited by required qualifications and particularly in that on the signing of the stipulated

contract they were given, without deposit or partial payment, a further period of three days after signing to perform, and the unusual nature of the transaction, the amount of shares and the value of them made advisable the careful selection of those employed to find acceptable buyers; all this negates a construction that the right to delegate was implicit in the agreement. James was particularly concerned about representations which might be made in connection with approaches to prospective purchasers. Even with W&P, James made provision in the contracts to be signed that W&P had made no representations on its behalf except as specified in the agreement. It was not contemplated by James that the stock, valued at almost $13,000,000, should be peddled about indiscriminately in the market.

■ But, even if I assume that W&P did have power to employ a sub-agent, they could delegate no greater authority than they themselves had.[19] Since W&P had no authority to contract on behalf of James, Breck and Baird were without power to do so.

■■ And I have found on the facts that irrespective of whether authority had been given W&P by James to solicit acceptances of an offer to sell under the agreement, W&P refused to submit any proposal by Alleghany to buy except as one made outside the agreement. The most that can be drawn from the mention of the possible employment by W&P of "associates" to perform under their direction and supervision minor, incidental and subordinate functions is the canvassing of probable purchasers.[20] It

---

17. Paragraph "4" and paragraph "1" of Exhibit "A" of the agreement of January 29, 1951.

18. Lyon v. Jerome, 26 Wend. 485, 494; O. A. Skutt v. J. & H. Goodwin, 251 App.Div. 84, 295 N.Y.S. 772; Meecham on Agency, § 307.

19. Meecham on Agency, § 304.
Delegation is defined as "the power of an agent to appoint a substitute to do all or an assistant to do part of that which he was authorized to do."

Id. § 326:
"Whenever a subagent, etc. has been lawfully employed * * * he undoubtedly acts so far with the consent of the principal that the latter is bound by the act of the subagent done within the authority confided to him and within the scope of the authority conferred upon the original agent."

20. "The word 'associate,' undoubtedly, has among its meanings that of 'partner';

reserved to W&P the determination of whom to produce as purchasers and to James the final decision as to whom it would accept and with whom it would contract.

But something far more fundamental to plaintiffs' claims is lacking: the agreement of January 29, 1951 is not an offer by James to sell its Western stock nor authority to W&P to convey an offer to others.[21]

The instrument " * * * is neither an agreement for sale nor an offer to sell to any particular person, or to the world at large." [22] It "was not designed as a proposal" and therefore did not suffice "as a proposition to be acted upon".[23] I do not read the agreement as an offer to sell capable of being converted into a contract of sale by an acceptance.

■■ The undertaking in paragraph "3" of the agreement that "James Foundation agrees to hold such Western Pacific Railroad stock available for sale to such purchasers found by Messrs. Wyer and Pflugfelder up to 3 p. m., Wednesday February 14, 1951 and * * * to enter into contracts of sale with such purchaser * * *" may not be read as a separate, single, isolated understanding. It must be interpreted as but one of the many provisions of the agreement, providing for the employment of W&P as brokers, and stipulating when the commissions shall be deemed to have been earned. This provision affords protection to W&P that, having met all specified conditions with respect to purchasers produced, the stock will be ready for delivery and that James will be able to contract for its sale and perform. It was a binding promise to W&P that James would not sell the stock prior to February 14, 1951 and that it would not arbitrarily refuse to enter into the written contract with a qualified purchaser when produced. This undertaking ran to W&P to whom it was given; as to them it was a valid obligation.[24] It was purely and simply an undertaking by James to deal with W&P and no others for the sale of the stock within the period stated.

But, this was not a promise on the part of James, which one "should reasonably expect to induce action or forbearance of a definite and substantial character" on the part of third parties, strangers to the agreement who never in fact saw it until after they had accepted the offer.[25] Nor can it be held that this promise by James induced the action of Alleghany or its assignors; their acts followed alone upon the unauthorized representations of Baird and Breck.[26]

---

but manifestly it does not indicate a partnership conclusively, for a mere employee may well be an 'associate' of his employer." Smith v. Maine, 145 Misc. 521, 260 N.Y.S. 409, at page 419.

The resolution of any patent ambiguity must depend solely upon the writing, unaided by parol evidence. Williston on Contracts, § 627, Bacon's Maxims, Rule 23. When dictated by context, a contract term which appears to be clear may well be found to have another meaning. Restatement of Contracts, § 235, Comment (d).

21. Corbin on Contracts, § 27, and cases thereto appended.

22. Haydock v. Stow, 1869, 40 N.Y. 363, 368.

23. Barnett v. McCrea, 1894, 76 Hun. 610, 27 N.Y.S. 820, 821.

24. N.Y.Pers.Prop.Law, § 33(5).

25. "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement of Contracts, § 90.

To have a binding contract, there must be "not merely assent to the terms (of the offer), but assent to the offer," itself. Williston on Contracts, § 33. "It is probable, indeed, that the chief reason for enforcing a promise is that it has induced the promisee to act in reliance upon it. One who has rendered a service without knowledge of an offered promise has not so acted." Corbin on Contracts, § 59. See also: Restatement of Contracts, § 33, Grismore on Contracts, § 43.

26. Restatement of Contracts, §§ 80, 285.

As between James and W&P the agreement of January 29, 1951 was a bilateral contract, valid and enforceable in New York because in writing and because of the mutual promises it contained. W&P, in effect, promised to make reasonable efforts to produce prospective purchasers who would make offers to buy according to the terms of the agreement. James promised not to sell its Western stock and to hold it available until February 14, 1951 for sale to qualified prospective purchasers W&P might produce, and to pay the stated commissions on a completed sale.[27]

W&P were authorized to exhibit their contract with James to prospective purchasers (Para. 3, fourth sentence; Ex. A annexed, para. 1; Ex. B annexed, para. 4, 3rd sentence). A pivotal question in construing the agreement is what effect is to be given to these provisions. I read these only as "feelers" going out beyond the agreement between W&P and James; they are not to be taken as an operative offer to prospective purchasers. They are nothing more than an expression of intention on the part of James to prospective purchasers.[28] Paragraph "6" speaks of "contemplated contracts of sale"; paragraph "8" provides that contracts "shall be entered into and the closing shall take place." The phrase "to produce purchasers" is not one of promise.

The question is presented: did this statement of intention made by James confer a power upon W&P, their associates or the corporations to which its contents might have been revealed to render James bound to a legally enforceable contract? I hold that it did not. "The only general test which can be submitted as a guide is an inquiry whether the facts show that some performance was promised in positive terms in return for something requested." (Williston—Contracts, vol. 1, Sec. 27, p. 58, 1936 Ed.) A positively stated promised performance is lacking here.

The agreement was not such an act on the part of James as would lead either W&P, their associates or parties to whom it was shown "reasonably to believe that a power to create a contract is conferred upon * * *" them (Corbin, etc. 26 Yale L. J. 182). The agreement must be read with recognition of the essential difference between preliminary negotiations and final agreement. It presses imagination too strongly to seriously entertain the conclusion that the agreement of January 29, 1951 was an irrevocable offer which James empowered W&P not only to extend but under which to receive acceptances.

Assuming arguendo that the agreement is held to be an offer by James to sell and that W&P were authorized to convey the offer to prospective purchasers and to appoint sub-agents also to convey the offer, there was no acceptance on February 5, 1951 as alleged in the first count of the complaint. It is urged in support of this claim that the offer was accepted orally on this date. The agreement, however, provided for the only method of acceptance—that is, by the execution of the designated form of contract Exhibit "B" annexed to the agreement. James had full power at the time it drafted and signed the agreement of January 29, 1951 to determine how, when and by what acts it would be bound. An oral acceptance could not in any event be made; it is undisputed that no contracts were signed on February 5, 1951.[29] It has been found that

---

27. This suit does not assert a claim for any commission or compensation which may have been earned by W&P. Whether such compensation was in fact earned is immaterial.

28. Grismore on Contracts, § 13; Corbin on Contracts, § 22.

29. The following definitions and statements of law in "Offer and Acceptance and Some of the Resulting Legal Relations" (Arthur L. Corbin, 26 Yale Law Journal, January 1917) are accepted as also being the law of New York, which it is conceded is here applicable:

"An offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract" (p. 171).

"An acceptance is the exercise of

at that time neither Baird, Young nor Purcell knew of the requirements for a written contract. If it be held that an authorized offer was made, clearly there was no acceptance on February 5, 1951.

█ There was no acceptance on February 8, 1951 because the agreement of January 29, 1951, if it be an offer, was only to purchasers produced by W&P and they had refused to submit plaintiffs or Alleghany's assignors as purchasers under the agreement.

Indeed, a review of the evidence leaves the impression and leads to a conclusion that plaintiffs themselves (and Alleghany's assignors) decided on February 7, 1951 that no contract had been made with James on February 5, 1951 and that they reached a similar decision on February 14, 1951 when they again made a tender of contract and again at increased prices. The forms of contract tendered on February 14, 1951 were not offered in evidence by the plaintiffs and no claim is made by them that a contract was made on February 14, 1951 or that the documents of that date were a memorial of an oral contract made on a prior date.

█ 9. The plaintiffs would not in any event be entitled to the equitable relief of specific performance for they could be amply compensated with money damages; the failure of plaintiffs to apply for injunctive relief during the pendency of this suit would dictate that the granting of this extraordinary equitable relief be denied. Specific performance would require the purchase of the stock to be made by the defendant, for it has sold almost all of the stock the delivery of which is now sought.

10. That the assignments executed by Union, Tri-Continental and Selected were effective to legally transfer and assign to Alleghany any and all right or claims possessed by them against the defendant.

11. That defendant is entitled to judgment dismissing the complaint herein on the merits with costs and disbursements, and the Clerk is directed to enter judgment herein accordingly.

### APPENDIX "A"
#### MEMORANDUM

Agreement Between James Foundation of New York, Inc., First Party and William Wyer of East Orange, New Jersey and William H. Pflugfelder of New York, N. Y., Second Party

*Representations:*

1. James Foundation owns 55,727 shares of preferred stock of The Western Pacific Railroad Company and 153,-165 shares of the common stock of The Western Pacific Railroad Company; it has full power and right to sell and transfer all said shares; and the execution of this agreement and the sale and transfer of such stock pursuant to this agreement has been approved and authorized by the Trustees of the James Foundation.

2. Messrs. Wyer and Pflugfelder have approached the James Foundation with a proposal that they expect to be able, in the absence of unexpected developments, to produce purchasers during the period prior to February 15, 1951, for all the stock of Western Pacific Railroad Company held by James Foundation at or about the current market price for such stock. They represent that such purchasers will be persons or institutions, who will buy the stock for their own account for investment and not for distribution to the public, and that such stock has been and [1] will be of-

---

the power conferred by the offer, by the performance of some other act or acts" (p. 171).

"So long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no offer" (p. 182).

"The offeror is the creator of the power and before it leaves his hands he may fashion it to his will" (p. 183).

1. The following matter is handwritten in margin opposite words stricken through:
   J.F. of N.Y.Inc.
   by R.E.C. V.P.
   W.W.
      WH

fered to an aggregate of less than twenty such persons.

*Commitments:*

3. James Foundation agrees to hold such Western Pacific Railroad Company stock available for sale to such purchasers found by Messrs. Wyer and Pflugfelder up to ~~until~~ [2] 3:00 P.M., Wednesday, February 14, 1951, and in the event Messrs. Wyer and Pflugfelder are able to produce such purchasers for all (but not less than all) of said stock on or prior to that date to enter into contracts of sale with such purchasers for the sale of such stock at or about the last closing prices prior to the entering into of such contracts of sale, but, in no event, at prices which shall amount to less than $12,896,588 in the aggregate for all of said stock. Such contracts of sale shall include representations by the James Foundation as to its ownership of and authority to sell the stock, and James Foundation will agree to furnish at the closing, upon request of the purchasers, opinion of counsel, who may be of counsel to the Foundation, in support of such representations. Such contracts of sale shall also include representations by the purchasers that they have purchased the stock for their own account for investment and not with a view to the distribution thereof. Said purchasers shall also represent in said contracts of sale that Messrs. Wyer and Pflugfelder have made no representations to them in behalf of James Foundation in connection with such sale except as herein specified. The regular quarterly dividend on said preferred and common stock, payable February 15, 1951, to stockholders of record of February 1, 1951, is the property of the James Foundation and said contracts of sale shall not provide for a transfer of such stock prior to the record date specified. James Foundation shall pay all transfer taxes incident to the sale by James Foundation to the purchasers. Said contracts of sale shall be substantially in the form annexed hereto as Exhibit B, and made a part hereof.

4. James Foundation agrees to pay to Messrs. Wyer and Pflugfelder at the closing, when payment for all such stock, but not less than all, is received, the agreed upon commission set forth in Exhibit A attached hereto and made a part hereof. Unless the actual transfer and payment for all such stock takes place pursuant to said contracts of sale, Messrs. Wyer and Pflugfelder shall be entitled to no commission. Messrs. Wyer and Pflugfelder undertake and agree to pay all legal and proper claims for commission or for expenses of any person or persons whom they may associate with them in this transaction and to defend the James Foundation against any claims asserted against it for commissions or expenses by any person or persons asserting any right thereto in connection with this transaction.

5. Messrs. Wyer and Pflugfelder agree to use their best efforts to produce purchasers for the stock in accordance with this agreement. Prior to February 15, 1951, the James Foundation will not make any offer, or attempt to sell, or authorize anyone to negotiate for the sale of, or accept any other offer for the purchase of, any of such shares.

*General Understandings:*

6. The contemplated contracts of sale with the purchasers to be produced by Messrs. Wyer and Pflugfelder shall be made simultaneously and the prices for the stock shall be as hereinabove provided and as set forth more specifically in said Exhibit A.

7. In the event Messrs. Wyer and Pflugfelder do not find purchasers for all of the stock as herein proposed prior to 3:00 P.M., Wednesday, February 14, 1951, this agreement shall become void and of no effect and Messrs. Wyer and Pflugfelder shall have no rights or claims against the James Foundation for

2. The following matter is handwritten in margin opposite words stricken through:

J.F. of N.Y.Inc.
by R.E.C. V.P.
W.W.
      WH

claimed services rendered by them or for expenses incurred or for commission or other claim in event James Foundation should subsequently sell all or any part of said preferred or common stock of The Western Pacific Railroad Company to any of the prospective purchasers contacted by Messrs. Wyer and Pflugfelder or to other purchasers.

8. The contracts of sale shall be entered into and the closing shall take place at the Central Hanover Bank and Trust Company, 70 Broadway, New York, N. Y., unless the parties otherwise agree. Actual delivery of the stock against certified checks of the purchasers, payable in New York Clearing House funds to the order of James Foundation of New York, Inc., shall be made on the third business day after the date the contemplated concurrent contracts of sale are executed as above provided.

9. The rights of Messrs. Wyer and Pflugfelder are not assignable or transferable in any respect.

New York, N. Y.
Jan. 29, 1951

      JAMES FOUNDATION OF NEW YORK, INC.
      By (Signed) ROBERT E. COULSON
                     Vice-President

Attest:
    CHARLES E. ANDREWS
      Asst. Secy.

    (Signed) WILLIAM WYER    L.S.
    (Signed) WM. H. PFLUGFELDER  L.S.
Witness:
    EILEEN BUKMAN

### EXHIBIT A

1. The commission to be paid by James Foundation to Messrs. Wyer and Pflugfelder, in the event such stock is transferred and payment received pursuant to the foregoing agreement, will be $313,338 which shall be full settlement for their services and expenses in connection with the transaction and for the services and expenses of any others whom they may associate with them in this transaction. This agreed upon com-

mission shall be subject to adjustments as follows: In the event the sales are concluded on a basis which will yield an aggregate price to the James Foundation in excess of $12,896,588, the commission shall be increased by an amount equal to one-fourth of such excess, provided that, in no event, shall such additional commission be more than $104,-446.

2. The prices for the stock to be stated in the contracts of sale with the purchasers shall be such as to produce an aggregate gross price to the James Foundation of not less than would have been produced if the stock were sold at the market price for such stock at the last closing prices prior to the entering into of such contracts of sale but in no event shall this agreement be construed to require the James Foundation to consummate a sale or sales of the stock at less than $12,896,588 in the aggregate.

### EXHIBIT B

Memorandum Agreement made ......, 1951, between James Foundation of New York, Inc., a New York Corporation, Seller and ......, Purchaser

1. *Agreement of Sale:* Pursuant to the terms of an agreement between the Seller and William Wyer and William H. Pflugfelder, made the ...... day of January, 1951, with which the Purchaser is familiar, the Seller hereby agrees to sell and the Purchaser to purchase ...... shares of the preferred stock and ...... shares of the common stock of The Western Pacific Railroad Company, a California corporation.

2. *Purchase Price:* The agreed upon purchase price for said shares shall be $...... per share for the preferred stock and $...... per share for the common stock or an aggregate of $.......

3. *Closing:* Delivery of the stock and payment of the purchase price shall be made on February ......, 1951, at the office of the Central Hanover Bank and Trust Company, 70 Broad-

way, New York, N. Y. Payment for the stock shall be in cash or by certified check payable in New York funds to the order of James Foundation of New York, Inc.

4. *Representations:* Seller represents that it is the owner of the stock sold to the Purchaser and has full power and authority to sell such stock and will, upon request of Purchaser, provide at the closing opinion of counsel, who may be counsel to the Seller, supporting such representations. Purchaser represents that it is purchasing the stock for its own account for investment and not with a view to the distribution thereof. Purchaser further represents that Messrs. Wyer and Pflugfelder have made no representations to Purchaser in behalf of James Foundation in connection with this sale except as herein specified.

5. *General Understanding:* The regular quarterly dividends upon such preferred and common stock of The Western Pacific Railroad Company, payable February 15, 1951, to stockholders of record of February 1, 1951, belong to the Seller and will be received and retained by the Seller.

New York, N. Y.

......, 1951

    JAMES FOUNDATION OF NEW YORK, INC.