**ALLEGHANY CORP. et al.**

v.

**JAMES FOUNDATION OF NEW YORK, Inc.**

No. 175, Docket 22947.

United States Court of Appeals, Second Circuit.

Argued May 3, 1954.

Decided June 8, 1954.

Rehearing Denied Aug. 3, 1954.

York City, William Eldred Jackson, Mineola, N. Y., and Janet P. Kane, New York City, of counsel), for appellee.

Before CHASE, Chief Judge and FRANK and HINCKS, Circuit Judges.

FRANK, Circuit Judge.

As the facts are fully stated in the opinion and findings of the district judge, reported in 115 F.Supp. 282, we shall not repeat them.

■ We shall assume, *arguendo*, that the James Foundation had conferred upon W & P authority to make a contract for the sale of the stock constituting control of the Western Pacific Railroad Company, and also authority to delegate that authority to S & Co. and Baird; that W & P did thus delegate that authority; that accordingly, on either February 5 or 8, 1951, a contract for the purchase and sale of the stock was made which bound both Alleghany and the James Foundation; and that that contract did not run afoul of the Statute of Frauds. Nevertheless, we affirm for the following reasons:

The agreement between the James Foundation and W & P provided that, if any contract of sale were made, then delivery of the stock by the James Foundation and payment by the purchaser were to occur on the third business day after the date of such contract. If a contract was made on either February 5 or February 8, then it was necessary that Alleghany be able to pay the purchase price, and for the James Foundation to deliver the stock, on either February 8 or February 11. For, considering the circumstances and the character of the agreement between the James Foundation and W & P, time was plainly of the essence.

■ Alleghany then had control of the Chesapeake & Ohio Railroad. Under 49 U.S.C.A. § 5, the Chesapeake & Ohio is a common carrier as are Western Pacific and Allegheny (because of the latter's control of Chesapeake & Ohio). 49 U.S.C.A. § 5(4) provides that "It shall be unlawful for any person," with-

White & Case, New York City (Arthur L. Corbin, New Haven, Conn., Robert J. Bulkley, Cleveland, Ohio, J. Adam Murphy and Melvin L. Milligan, II, New York City, of counsel), for appellant.

Milbank, Tweed, Hope & Hadley, New York City (A. Donald MacKinnon, New

out the approval of the Interstate Commerce Commission, "to enter into any transaction" by which a carrier will "acquire control of another carrier," or "to accomplish or effectuate, or to participate in accomplishing or effectuating" the control or management in a common interest of any two or more carriers. * * *" It is highly improbable that, in the brief period available,[1] Alleghany could have procured the approval of the Interstate Commerce Commission of the acquisition of the controlling interest in Western Pacific.[2]

1. The agreement between the James Foundation and W & P also provided that the power delegated to W & P should cease to exist on February 14, 1951. Assuming, *arguendo*, that it would have sufficed if Alleghany were able to perform by February 14, still Alleghany had, at most, but nine days to procure Interstate Commerce Commission approval.

2. Pertinent portions of 49 U.S.C.A. § 5 read as follows:

"(2) (a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)— (i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise; or (ii) for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto.

"(b) Whenever a transaction is proposed under subparagraph (a), the carrier or carriers or person seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants (and, in case carriers by motor vehicle are involved, the persons specified in section 305(e)), and shall afford reasonable opportunity for interested parties to be heard. If the Commission shall consider it necessary in order to determine whether the findings specified below may properly be made, it shall set said application for public hearing; and a public hearing shall be held in all cases where carriers by railroad are involved unless the Commission determines that a public hearing is not necessary in the public interest. If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: Provided, That if a carrier by railroad subject to this chapter, or any person which is controlled by such a carrier, or affiliated therewith within the meaning of paragraph (6), is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition.

"(c) In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.

"(d) The Commission shall have authority in the case of a proposed transaction under this paragraph (2) involving a railroad or railroads, as a prerequisite to its approval of the proposed transaction, to require, upon equitable terms, the inclusion of another railroad or other railroads in the territory involved, upon petition by such railroad or railroads requesting such inclusion, and upon a

Alleghany had the burden of proving that it could have done so. This burden

Alleghany did not discharge. Indeed, it never took any steps to submit the mat-

finding that such inclusion is consistent with the public interest.

\* \* \* \* \*

"(3) Whenever a person which is not a carrier is authorized, by an order entered under paragraph (2), to acquire control of any carrier or of two or more carriers, such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier subject to such of the following provisions as are applicable to any carrier involved in such acquisition of control: Section 20(1) to (10), inclusive, of this chapter, sections 304(a) (1) and (2) and 320 of chapter 8 of this title, and section 913 of chapter 12 of this title, (which relate to reports, accounts, and so forth, of carriers), and section 20a(2) to (11), inclusive, of this chapter, and section 314 of chapter 8 of this title, (which relate to issues of securities and assumptions of liability of carriers), including in each case the penalties applicable in the case of violations of such provisions. In the application of such provisions of section 20a of this chapter and of section 314 of chapter 8 of this title, in the case of any such person, the Commission shall authorize the issue or assumption applied for only if it finds that such issue or assumption is consistent with the proper performance of its service to the public by each carrier which is under the control of such person, that it will not impair the ability of any such carrier to perform such service, and that it is otherwise consistent with the public interest.

"(4) It shall be unlawful for any person, except as provided in paragraph (2), to enter into any transaction within the scope of subparagraph (a) thereof, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provision. As used in this paragraph and paragraph (5), the words 'control or management' shall be construed to include the power to exercise control or management.

"(5) For the purposes of this section, but not in anywise limiting the applica-

tion of the provisions thereof, any transaction shall be deemed to accomplish or effectuate the control or management in a common interest of two carriers—(a) if such transaction is by a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier; (b) if such transaction is by a person affiliated with a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier; (c) if such transaction is by two or more persons acting together, one of whom is a carrier or is affiliated with a carrier, and if the effect of such transaction is to place such persons and carriers and persons affiliated with any one of them and persons affiliated with any such affiliated carrier, taken together, in control of another carrier.

"(6) For the purposes of this section a person shall be held to be affiliated with a carrier if, by reason of the relationship of such person to such carrier (whether by reason of the method of, or circumstances surrounding organization or operation, or whether established through common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or any other direct or indirect means), it is reasonable to believe that the affairs of any carrier of which control may be acquired by such person will be managed in the interest of such other carrier.

"(7) The Commission is hereby authorized, upon complaint or upon its own initiative without complaint, but after notice and hearing, to investigate and determine whether any person is violating the provisions of paragraph (4). If the Commission finds after such investigation that such person is violating the provisions of such paragraph, it shall by order require such person to take such action as may be necessary, in the opinion of the Commission, to prevent continuance of such violation. The provisions of this paragraph shall be in addition to, and not in substitution for, any other enforcement provisions contained in this chapter; and with respect to any violation of paragraphs (2) to (12), inclusive, of this section, any penalty provision applying to such a violation by a common carrier subject to this chapter shall apply to such a violation by any other person.

"(8) The district courts of the United States shall have jurisdiction upon the complaint of the Commission, alleging a

ter to the Commission.[3]

It follows that (ignoring for the moment the Commission's decision in Chesapeake & O. Ry. Co. Purchase, 261 ICC 239) Alleghany could not lawfully have become owner of the stock within the required period and therefore would have been unable to perform the contract with the James Foundation. For, although Alleghany and the James Foundation could validly contract for the purchase and sale of this controlling interest without previous Interstate Commerce Commission approval,[4] nevertheless, absent such approval, the performance of that contract—the "accomplishing" or the "effectuating" of the acquisition of the stock—would have been illegal, and, under 49 U.S.C.A. §§ 5(4), 5(7), and 10

(1),[5] would have made each of the parties guilty of a crime. No court should encourage violation of the clear statutory policy by enforcing performance of such a contract—whether by awarding specific performance of the acquisition or damages for not performing—when Commission approval could not be had within the time limit.[5a]

It may be suggested that, had the James Foundation itself (*i. e.*, not through an agent) entered into the contract, there would have been an implied waiver of the time provision. Such a suggestion would be of doubtful cogency since, in the face of that provision, it would seem that Alleghany took the risk of not in time procuring the Commission's approval. But we need not now

---

violation of any of the provisions of this section or disobedience of any order issued by the Commission thereunder by any person, to issue such writs of injunction or other proper process, mandatory or otherwise, as may be necessary to restrain such person from violation of such provision or to compel obedience to such order."

The trial judge found that "The purpose of Alleghany in offering to purchase the James Western common stock was to acquire control of Western. * * *" This finding is supported by the allegations of Alleghany's complaint and by the testimony of Young, Chairman of the Board of Alleghany. [115 F.Supp. 293.]

3. The trial judge found the following: The trustees of the James Foundation on February 8 requested Wyer "to see one of the Interstate Commerce Commissioners to informally present the matter and endeavour to secure an unofficial reaction to a sale to Alleghany. The next day, February 9, Wyer did go to Washington and there saw a member of the Commission. Wyer was advised, in substance, that should the matter be duly presented, the Commission would probably institute an investigation to determine whether the transfer involved a violation of Secs. 5(2) and (4) of the Act".

4. See, e. g., Watson Bros. Transportation Co. v. Jaffa, 8 Cir., 143 F.2d 340; O. C. Wiley & Sons, Inc., D.C., 85 F.Supp. 542, affirmed 338 U.S. 902, 70 S.Ct. 308, 94 L.Ed. 554; Cleveland, C. C. & St. L. Ry. Co. v. Jackson, 6 Cir., 22 F.2d 509; Zabarsky v. Flemings, 113 Vt. 200, 32 A.

2d 663; Royal Blue Coaches, Inc., v. Delaware River Coach Lines, Inc., 140 N.J.Eq. 19, 52 A.2d 763, appeal dismissed, 2 N.J. 73, 65 A.2d 264; McLean v. Keith, 236 N.C. 59, 72 S.E.2d 44.

5. 49 U.S.C.A. § 10(1), so far as pertinent, reads as follows: "Any common carrier subject to the provisions of this chapter, or whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation who, alone or with any other corporation, company, person, or party, shall willfully do or cause to be done, or shall willingly suffer or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or who shall aid or abet therein, or shall willfully omit or fail to do any act, matter, or thing in this chapter required to be done, or shall cause or willingly suffer or permit any act, matter, or thing so directed or required by this chapter to be done not to be so done, or shall aid or abet any such omission or failure, or shall be guilty of any infraction of this chapter for which no penalty is otherwise provided, or who shall aid or abet therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States within the jurisdiction of which such offense was committed, be subject to a fine of not to exceed $5,000 for each offense: * * *."

5a. See, e. g., Kaiser-Frazer Corp. v. Otis & Co., 2 Cir., 195 F.2d 838, 843–844.

so decide, since here the sales contract was made by agents whose sole authority, contained in the agreement between the Foundation and W & P, gave no power to waive the time provision, and the Foundation did not in any way ratify such an implied waiver.

We think the Interstate Commerce Commission, by its decision in *Chesapeake & O. Ry. Co. Purchase*, 261 ICC 239 (1945), did not give advance approval of any future purchase by Alleghany of the controlling stock of any railroad, provided only Alleghany deposited the stock with the Chase National Bank under the trust agreement which conferred on that bank as trustee the exclusive power to vote the stock, since, in its opinion in that case, the Commission stated (p. 241): "It is the intention of Alleghany to acquire or dispose of securities of other corporations from time to time, including securities of carriers subject to regulation under the Interstate Commerce Act. It is, however, Alleghany's intention to limit its control of such carriers to the Chesapeake & Ohio and its affiliated carriers so long as such control continues and *subject to the right of Alleghany to apply for control of such other carrier or carriers as it may consider to be in the public interest.*" [6] The Commission also said (p. 261): "We have given careful consideration to the proposal by Alleghany in its petition filed on April 13, 1945, and heretofore described more in detail, with respect to *limiting its control of carriers subject to the Act to only the Chesapeake & Ohio and its affiliated companies, unless further authorization be granted by us.* We conclude that such restriction of control is desirable and shall impose conditions in this respect." [7]

These statements must, we think, be read as qualifying the approval the Commission gave in 1945 of the retention or purchase by Alleghany of the stocks then specifically under consideration. Otherwise, there would have been a surprising advance benediction of all Alleghany's future acquisitions of control. 49 U.S.C. A. § 5(2)(b) requires that, "Whenever a transaction [for control] is proposed", the Commission, before entering an approval order, "shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated," shall "afford reasonable opportunity for interested parties to be heard", and shall make a finding that the transaction "will be consistent with the public interest". This requirement, we think, precludes the entry of any blanket Commission order approving future control-acquisitions of any un-named railroad whatsoever.

Affirmed.

### On Petition for Rehearing.

Plaintiffs, in a petition for rehearing, virtually concede that our opinion is correct except insofar as it relates to the meaning and effect of the decision and order of the Commission in *Chesapeake & Ohio Ry. Co. Purchase*, 261 ICC 239 (1945). Plaintiffs' arguments may be summarized thus:

(a) The Commission's 1945 opinion, as interpreted in a subsequent opinion of the Commission, allowed Alleghany to purchase controlling blocks of stock, of any number of railroads, without further ICC approval, provided only that Alleghany trusteed such stock. (b) "Alleghany planned immediately on purchase to deposit the stock under the trust deed" with the Chase Bank, and thus would not acquire control within the meaning of Section 5(2) of the Interstate Commerce Act. This court, therefore, erred in holding that Alleghany could not lawfully acquire the Western stock without new Commission approval, and accordingly erred in holding that Alleghany had, and failed to sustain, the burden of proving that it could have obtained such approval within the short period for delivery provided in the contract. We shall discuss these contentions in turn.

1. *Contention that the ICC in 1945 authorized Alleghany in the future to ac-*

---

6. Emphasis added.

7. Emphasis added.

**452**

*quire, without further ICC approval, the controlling shares of stock of any number of railroads, provided only these shares were deposited with the Chase under the trust agreement.*

In their rehearing petition, plaintiffs for the first time refer to Matter of Chesapeake & Ohio Ry. Co. Purchase, 271 ICC 5, decided in 1948. In that case, the Commission had before it an application to modify its earlier 1945 order—Chesapeake & Ohio Ry. Co. Purchase, 266 ICC 239—(1) to permit the transfer of legal title from Chase to Chesapeake & Ohio of 400,000 shares of the New York Central deposited with Chase, and (2) to permit Young and Bowman to become directors of New York Central while retaining their positions as directors of the Chesapeake & Ohio.[1] The evidence showed that, sometime before 1947, Alleghany, without any specific Commission approval had acquired the New York Central shares, had deposited them under the trust agreement with Chase, and had so advised the Commission.[2] Subsequently, Alleghany had transferred to Chesapeake & Ohio the voting trust certificates representing these deposited shares. The Commission in this 1948 case, refused the requested permissions on the ground that they would violate Sections 5(4) and 20a(12) of the Interstate Commerce Act, 49 U.S.C.A. §§ 5(4), 20a(12), and Section 7 of the Clayton Act, 15 U.S.C.A. § 18.

As we understand plaintiffs' rehearing petition, they argue thus: (1) The Interstate Commerce Commission in 1948 knew that, without specific Commission approval, Alleghany, some time after 1945, had acquired the New York Central shares and had transferred legal title to these shares to the Chase by depositing them under the trust agreement. (2) The Commission, in denying authorization of the transfer of legal title to the

New York Central shares from Chase to Chesapeake & Ohio, held that such a transfer would put Chesapeake & Ohio in control of the New York Central Railroad, within the meaning of Section 5(2) of the Interstate Commerce Act. (3) Thus the Commission held, in effect, that by the deposit of these shares with Chase, the Chase had obtained control of the New York Central Railroad. (4) Therefore, the Commission in 1948 inferentially interpreted its earlier (1945) opinion and order as authorizing Alleghany, without further approval, to acquire in the future the controlling shares of any and all railroads, provided only that Alleghany deposited such shares with Chase. (5) Consequently (so plaintiffs assert in their petition) if the Western stock were similarly deposited with Chase simultaneously with the delivery of that stock to Alleghany, then "Alleghany would never acquire the control of Western that would require the specific approval of the Interstate Commerce Commission. That 'control' would have passed directly to the Chase Bank."

We think this contention rests on a mistaken view of the Commission's 1948 opinion. The Commission did not there hold that the 400,000 shares of New York Central—comprising but 6.2% of its outstanding voting shares—constituted control of that railroad. The Commission explicitly stated that the proceeding was not an application "pertaining to control of the New York Central" under Section 5 of the Interstate Commerce Act. The Commission's opinion dealt at length with the two requests— to acquire title to the shares and to authorize the Chesapeake & Ohio directors to become New York Central directors —as intertwined. It pointed out that, according to the evidence, Alleghany and Young hoped that, if these two requests were granted, the result would soon be that the two railroads would be "man-

[1]. The Commission, in its 1945 opinion, had provided that neither Alleghany nor Chesapeake & Ohio should enter into interlocking directorates with any company the stock of which was trusteed with Chase.

[2]. Plaintiffs refer to a statement in a footnote in Pere Marquette Railway Company Merger, 267 ICC 207, to show that in 1947 the Commission knew of these facts.

aged in a common interest." The Commission stated that Young had testified he hoped to achieve this result through the exercise "of our persuasive powers" on the other New York Central directors, and that, if those persuasive powers failed, the petitioners would soon ask the Commission for permission to exercise control of that railroad. The opinion quoted Section 20a(12) of the Interstate Commerce Act as to interlocking directors of railroads.[3] It also quoted Section 7 of the Clayton Act,[4] and said that "the effect of the release of the stock of the New York Central from the trust together with the interlocking directorates sought by the applicants would be to substantially lessen competition between the New York Central and the Chesapeake & Ohio," adding that "the policy of Congress is to be found not only in the consolidation provisions of the Interstate Commerce Act, but also in the anti-trust Acts," and noted that Section 20a(12) of the Interstate Commerce Act should be considered in connection with the Clayton Act.

We think the Commission's opinion cannot be read. as holding (1) that the mere ownership of the 400,000 New York Central shares constituted control and (2) that, absent any specific Commission approval, a deposit by Alleghany of controlling shares of any railroad in trust with Chase satisfied Section 5 of the Interstate Commerce Act.

Plaintiffs have supplied further light on this 1948 opinion. After the filing of the petition for rehearing, this court asked both parties to answer questions which were substantially as follows: If, absent specific Commission approval, Chase, through deposits, acquired control of more than one railroad, would Chase itself not violate Section 5 of the Interstate Commerce Act? Therefore, if the 400,000 shares of the New York Central conferred control of that railroad, did Chase validly hold these shares? If these shares conferred such control, would not participation in accomplishing the deposit with Chase of the Western stock, while Chase continued to control the New York Central, make Alleghany, James and Chase violators of the Act? In a memorandum filed with us, plaintiffs, answering these questions, replied that the Commission, in its 1948 opinion, did not determine "whether the ownership of the 400,000 shares of the New York Central actually constituted control of that carrier."[5]

3. It reads in part as follows:
   "20a(12). It shall be unlawful for any person to hold the position of officer or director of more than one carrier, unless such holding shall have been authorized by order of the commission, upon due showing, in form and manner prescribed by the commission, that neither public nor private interests will be adversely affected thereby."

4. Section 7 of the Clayton Act reads in part as follows:
   "That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce. No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

5. Plaintiffs seem to argue that (1) even if the block of New York Central stock did constitute control, yet (2) Chase did not obtain that control, and therefore did not violate Section 5 of the Interstate Commerce Act, because the Commission retained the power to require the resignation of Chase as trustee and the substitution of another trustee in its place, and the Commission in this way "completely controlled the Chase." We think that argument untenable. Until Chase was removed, it had control, within the meaning of Section 5 of the Interstate

As we said in our original opinion in this case, we think that "Section 5 of the Interstate Commerce Act precludes the entry of any blanket Commission order approving further control-acquisitions of any unnamed railroad whatsoever." Only the most unequivocal statement by the Commission would induce us to believe that it had entered such a blanket order.[6]

The foregoing alone disposes of plaintiffs' petition. However, we think it well to consider also plaintiffs' second contention.

### 2. Contention that Alleghany intended immediately to trustee the Western stock.

Neither plaintiffs' original nor their amended complaint says a word about any deposit with Chase. The amended complaint alleges that Alleghany contracted to "purchase" the Western stock; states that this stock "could afford to its owner practical control and a voice in the management of the railroad," and "that Alleghany purchased the common stock because of its investment value and the qualities of control which it possessed"; and prays that defendant be directed to "deliver" that stock "to plaintiffs."

▆ The pleadings, and even more pronouncedly the evidence at the trial, raised the issue of the intent or purpose of Alleghany in its effort to buy the stock of Western. The trial judge reached no legal conclusion on the issue of illegality, because he held that no purchase agreement had ever been made. But, as an able and experienced trial judge, he wisely found the facts relative to that issue, in order to avoid another trial, should

we deem that issue important. Having heard and seen the witnesses testify, he found that "the purpose of Alleghany in offering to purchase the James' Western Pacific common stock was to acquire control of Western. * * * "[7] We think this finding amply supported by the evidence and therefore not "clearly erroneous." The evidence includes the following:

When Baird first approached Young on February 3, Baird "sounded out" Young on his possible interest in the purchase of a large block of Western, "amounting in effect to working control." Young replied that "we might well be interested." Baird testified that he had approached Young because he felt, from previous talks with Young, "that it would fit into his philosophy of a transcontinental railroad system." Young testified that alleghany sought to buy "control" of Western Pacific, and that this purchase "was moving in (the) direction of a transcontinental system," on which, Young said, "I have always set my heart." If, however, the stock were deposited in trust, so as to deprive Alleghany of voting power, Young's aim to acquire a transcontinental system would not be achieved.[8] Young further testified that Baird told him that Pflugfelder was "the controlling interest in the Denver & Rio Grande, and that if we accepted the Baird offer, his relationship with Mr. Pflugfelder was such that he could induce him to cooperate with us in a community of interests." Breck testified he had said to Baird "that were Alleghany Corporation to make this purchase

---

Commerce Act, of any deposited stock, if voting that stock gave control of a railroad under Section 5.

6. In an Appendix to this opinion, we discuss an argument, advanced by plaintiffs, based on the language of a Commission opinion in 1947.

7. The full sentence reads: "The purpose of Alleghany in offering to purchase the James' Western common stock was to acquire control of Western; however, Alleghany did not apply for or receive the approval of the Interstate Commerce Commission of any purchase by Alleghany of the James' Western common stock."

8. Plaintiffs point to a provision of the trust agreement with Chase providing that the "depositor" (Alleghany) may direct the trustee's vote as to corporate matters other than election of directors. It might be argued that, via this provision, Alleghany could vote for a merger or consolidation of Western with any other railroad. But any such transaction would be illegal without Commission approval, and the procuring of such approval was most conjectural. Cf. Chesapeake & Ohio Railway Company Purchase, 271 ICC 5 (1948).

through Mr. Wyer and ourselves, that we might establish a community of interests between the Western Pacific and the Denver & Rio Grande railroad at its principal connection in Salt Lake City, that it might increase the community of interests that already existed." These suggestions would have been meaningless unless Alleghany were to control the Western Pacific.[9]

Perhaps the foregoing is not conclusive. More important is Young's testimony that Breck said to him that, if Alleghany purchased the Western stock, Breck would like, through Young, to become a Western director. But if the stock were deposited with a trustee which would "independently" vote for directors, Young would have no means of satisfying Breck's desire.

True, Young testified that, when, on February 4, Kirby asked what would be the position of the Commission, Young responded that "there was no reason to believe that it would not be exactly similar to the position that it had taken on our purchase of large and possibly controlling blocks of the Rock Island and other railroads, which had been deposited with the Chase Bank under the agreement and without the slightest repercussion or question of any kind"; that "there was not the slightest thing to be concerned about"; and that he would take up the matter with Purcell. Purcell testified he had told Young on February 4 that it would be necessary to deposit the Western shares with Chase under the trust agreement, and that Young had "replied * * * that of course we would deposit the shares immediately upon purchase."

But—and here we come to crucial facts—no one on Alleghany's behalf took

any steps to arrange for such a deposit, or to confer with Chase about the matter —even after, on February 5, Wyer reported to Breck, Breck to Baird, and Baird to Young, that the trustees of the James Foundation would not accept any offer from Alleghany (outside the agreement with W & P) unless prior Commission approval were obtained.

The failure to take such steps is underscored by the following: Purcell testified that on February 4—the very day on which, according to the testimony of Young and Purcell, there had been a discussion of a deposit under the trust agreement with Chase—Young told Purcell that, if they went ahead with the purchase, Purcell should talk to Alleghany's banks with a view to substituting the Western Pacific stock for other items of collateral in Alleghany's bank loans. On February 5, when Young reported that he had made the purchase, he asked Purcell to take up this question with the banks. Anzalone, a vice president of Alleghany, testified that on February 5, he told the Chase that Alleghany was purchasing a substantial amount of Western Pacific stock and would like the Chase to substitute, as collateral under that bank's loans to Alleghany, as much Western Pacific common as possible for cash and governments. The Chase agreed. Significantly, although Chase was also the trustee under the trust agreement, there is no evidence that anything was said by Alleghany to Chase about depositing the Western stock in trust. On February 5, the Executive Committee of Alleghany passed a resolution authorizing the purchase of the Western stock; this resolution contains no reference to any deposit under the trust agreement.

9. See the preceding footnote.
  Young also testified as follows: In talking with Kirby, President of Alleghany, on February 4, Young said that Baird had offered him appellee's Western stock, "which would constitute control," and Kirby asked whether the block could be bought for less than Saturday's closing; Young had said no, that they ought to take it at Saturday's close and consider

themselves lucky, they were not only buying what he considered one of the most undervalued railroad stocks "but we were also buying control, and that I did not think we should quibble about the price," and that the stock represented "working control of the railroad"; later Young told Kirby that "we have bought the stock."

In a letter dated February 8, authorized by Young, Alleghany's attorneys wrote Seligman and Baird, saying they "had sold to Alleghany" the Western common stock, demanded delivery to Alleghany, and referred to suggestions about facilitating that delivery. The letter mentions nothing of a deposit with the Chase—although plaintiffs, in their petition for rehearing, say that the transfer would have been by James direct to the Chase, or to Alleghany, accompanied by simultaneous transfer by Alleghany to the Chase.

Considering the foregoing, and especially the omission from anything in writing concerning Alleghany's intent to deposit the stock in trust, we think the trial judge could properly refuse (as he obviously did) to credit the oral testimony on the subject, introduced by Alleghany, of witnesses he saw and heard.

Petition denied.

### Appendix.

In its 1945 opinion, the Commission had excepted, from the requirement that Alleghany trustee certain railroad stocks, "Alleghany's holdings of the stock of the Missouri Pacific Railroad Company which is now in reorganization under Section 77 of the Bankruptcy Act [11 U.S.C.A. § 205]." In 1947, in a proceeding for authority to merge the Pere Marquette into the Chesapeake & Ohio—Pere Marquette Railway Co. Merger, 267 ICC 207—an independent director of the Missouri Pacific intervened and asked the Commission to require Alleghany, as a preliminary to approval of the merger, to trustee its Missouri Pacific stock. The Commission refused. It said (267 ICC at 253): "The effect of the order in Chesapeake & Ohio Ry. Co. Purchase, supra, is to require the trusteeing of stock of the Missouri Pacific or any successor corporation that the Alleghany may receive in the reorganization of that company. In addition, the Alleghany has committed itself in this proceeding to deposit under the trust agreement any such stock so received by it. The trust agreement with the Chase National Bank, in

that proceeding, contemplates the further depositing of stock such as that here considered."

Plaintiffs argue that this language supports their interpretation of the 1945 opinion and order. We cannot agree. The statement in the 1947 opinion, that the trust agreement "contemplates the further depositing of such stock as that here considered," was made in the context of a consideration of the stock of Missouri Pacific or a successor which might emerge from a reorganization.

All the Interstate Commerce Commission said in effect was that its 1945 order required the trusteeing of the stock of Missouri Pacific, or such successor, received by Alleghany; that Alleghany in that proceeding had committed itself to trusteeing such stock; and that the trust agreement embodied such commitment as to such stock. The fact that Alleghany's holdings of Missouri Pacific stock were 33.81% of the common did not of course mean that Alleghany would receive an equivalent percentage, or even any, of the voting stock on the consummation of the reorganization, or that whatever amount it might receive would constitute control. All that the ICC could determine at the time, in the light of the situation then before it, was that any Missouri Pacific voting stock which Alleghany might later receive would be subject to the terms of the trust agreement. Future events alone would determine whether the ICC would ever face a question of control. The ICC was not dealing with an existing control situation. The Missouri Pacific shares presented a unique problem. While the Commission did not require Alleghany at that time to trustee those shares, since they were then not voting shares—Missouri Pacific being then in reorganization—the ICC stated that, "Should Alleghany acquire any voting stock at the conclusion of the court proceedings, such stock would be covered" by Alleghany's proposals, which included a proposal to trustee all voting stocks of carrier corporations then owned or thereafter acquired (261 ICC 239, 241). The Missouri Pacific situation was

given special consideration by the ICC because of its special circumstances. Accordingly, nothing in the ICC's treatment of Missouri Pacific can properly be taken as having general application to any other carriers, unnamed, whose stocks were not in Alleghany's portfolio at the time the ICC approved the trust indenture. The authorization of the future deposit of the stock of the reorganized Missouri Pacific was clearly limited to that unique situation with which the ICC, because of its function under Section 77 of the Bankruptcy Act, was, of course, entirely familiar. We think the Commission did not intend to extend that authorization to any number of other future control situations concerning which it was not advised.