Willis D. WOOD, Anna M. Wood, Union College, Milbank Foundation, and John Vanneck, Marie Louise Bailey and Barbara Bailey Vanneck, as Executors of the Estate of Frank Bailey, deceased, Plaintiffs,

v.

UNITED STATES of America and Western Maryland Railway Company, Defendants,

and

Interstate Commerce Commission and Baltimore and Ohio Railroad Company, Intervening Defendants.

United States District Court
S. D. New York.

June 13, 1955.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiffs (Lawrence A. Baker, Walter J. Holzka, Elliott E. Vose, New York City, of counsel).

Stanley N. Barnes, Asst. Atty. Gen., J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, New York City, James E. Kilday, Albert Parker, Charles R. Esherick, Sp. Assts. to the Atty. Gen., for defendant, United States.

Davis Polk Wardwell Sunderland & Kiendl, New York City, for defendant Western Maryland Railway Co. (Thomas O'Gorman FitzGibbon, New York City, William C. Purnell, Baltimore, Md., S. Hazard Gillespie, Jr., New York City, Norman C. Melvin, Jr., Baltimore, Md., of counsel).

Edward M. Reidy, Gen. Counsel, Washington, D. C., Leo H. Pou, Associate Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

F. E. Baukhages, Baltimore, Md., Robert Schwebel, New York City, for The Baltimore and Ohio Railroad Co., intervening defendant.

Before FRANK, Circuit Judge, and LEIBELL and WEINFELD, District Judges.

LEIBELL, District Judge.

This is an action under Title 28 U.S. C. § 1336, to enjoin, set aside and annul an order of Division 4 of the Interstate Commerce Commission, dated October 14, 1954.[1] A subsequent order made in a General Session of the Commission on February 21, 1955[2] denied reconsideration of the October 14, 1954 order and made said order effective as of February 21, 1955. The order of October 14, 1954 approved, with some slight modifications, a Plan[3] filed by Western Maryland Railway Company April 1, 1953 for alteration and modification of its capital stock structure.[4] The primary objective of the Plan of Western Maryland was the elimination of the dividends which had accumulated on its first preferred stock in the years 1921 to 1939 and the issuance of stock in place of the dividend arrearages.[5]

The plaintiffs, owning a total of 2760 shares of the first preferred stock of Western Maryland, intervened before the Examiner in opposition to the Plan[6] and supported before Division 4 the Examiner's adverse report.

The Baltimore and Ohio Railroad, as the beneficial owner of about 94% of the first preferred stock, intervened in

---

1. Exhibit D annexed to the amended complaint.

2. Exhibit E annexed to the amended complaint.

3. Exhibit A annexed to the amended complaint.

4. "As of December 31, 1952, applicant's outstanding capital obligations amounted to $137,728,302, consisting of capital stock $77,167,046 par value, funded debt $44,480,000, and equipment obligations $16,081,256. Outstanding capital stock consisted of 177,420 shares of $100 par value 7-percent cumulative first preferred stock, $17,742,000; 61,382 shares of $100 par value 4-percent noncumulative second preferred stock, $6,138,200; and 532,868,984 shares of $100 par value common stock, $53,286,894. Outstanding funded debt consisted of $29,530,000 of 4-percent Series A first mortgage bonds due October 1, 1969, and $14,950,000 of 4½-percent series B first mortgage bonds due November 1, 1976. The amounts of various equipment obligations outstanding and the dates when final payments thereon are due are as follows: $1,896,000, 1956; $3,480,000, 1958; $4,105,331, 1965; $3,304,000, 1966; and $3,295,925, 1968. The annual installment payments on the equipment obligations will be $2,236,795 in the years 1953 to 1956, inclusive. In addition, up to July 1, 1953, the applicant has also sold $2,010,000 of series G equipment trust obligations." Report of the Commission, Division 4.

5. Applicant proposes to amend its charter so as to permit the issuance of new 5-percent first preferred stock $100 par value, dividends cumulative to $15. per share at any one time; new 4-percent noncumulative second preferred stock $100 par value, convertible into 2 shares of new common stock; and new common stock $10 par value. For each present share of 7-percent cumulative first preferred stock and dividend accumulations there would be exchanged 2 shares of new 5-percent first preferred stock, 0.5 share of new 4-percent second preferred stock, and $10 in cash. Each present share of 4-percent noncumulative second preferred stock would be exchanged for 1 share of new 4-percent noncumulative second preferred stock; and each present share of common stock of a par value of $100 would be exchanged for 1 share of new common stock at the reduced $10 par value.

6. Exhibit B annexed to the amended complaint.

support of the Plan. In addition to its holdings of first preferred stock, B & O also owned about 13% of Western Maryland's second preferred stock and almost 30% of its common stock. Its holdings of all classes of Western Maryland's stock totaled 334,177 shares, or about 43%.

Because the B & O's holdings of stock in a competing railroad, the Western Maryland, was so large as to give it control of Western Maryland, the I.C.C. had issued a restraining order in January 1930. (I. C. C. v. Baltimore & Ohio Railroad Co., 160 I. C. C. 785.) In order to meet the provision of that order that B & O divest itself of voting control of Western Maryland the B & O deposited its Western Maryland stock with the Chase National Bank, as trustee, under a trust agreement, dated January 13, 1932 (supplemented December 1, 1942) which gave Chase, as trustee, a proxy to vote Baltimore & Ohio's stock in Western Maryland.[6a] The extent of that proxy and the scope of the trust agreement— whether they were limited to matters connected with management and control of Western Maryland and whether Baltimore & Ohio, as beneficial owner, retained the right to vote the stock on any plan for the reorganization of the capital structure of Western Maryland—were among the points argued before the Commission and this Court. Plaintiffs contend that B & O did not have the right to vote its first preferred stock in favor of the Plan and that therefore the Plan lacked the necessary 75% of assents from the first preferred stockholders. 20b(2) of T. 49 U.S.C.A. The Commission has ruled that the right to assent [6b] the stock rested with B & O as the beneficial owner of the shares. Of course, Chase did not vote the stock.

The April 1, 1953 plan of Western Maryland was assented to without objection by the second preferred stockholders and by the owners of the common stock. The Baltimore & Ohio voted all its stockholdings in favor of the Plan. What the B & O would receive under the Plan would increase the percentage of B & O's total stock ownership in Western Maryland from 43.3% to 56.8%. There were advantages that Baltimore & Ohio could derive from the Plan that were not available to the plaintiffs, whose ownership is limited to first preferred stock, and there appear to be certain disadvantages to plaintiffs in the Plan as approved. But it will not be necessary to discuss the merits of the Plan, in view of the jurisdictional grounds on which this Court will rest its decision.

The opinion filed by Division 4 states: —"The primary objective of the applicant's proposed alterations and modifications is the elimination of the dividend arrearages on its first preferred stock thereby making a declaration of immediate dividends on its second preferred and common stocks possible; the elimination of the provisions of its first-preferred stock for unlimited cumulations of unpaid dividends; a reduction in the rate of dividends per share of first preferred stock; and the opening of a way for future equity financing".[7] The plaintiff's brief in this action states that:—

"The question raised by this case is whether the Railway, which is in good financial condition and has even better prospects for the future, nevertheless has a right to resort to Section 20b to impose upon objecting first preferred stockholders a plan to modify its capital stock structure to eliminate accumulated dividend arrears on that stock solely in order to make payment of dividends on common and second preferred stock."

---

6a. The trust agreement was approved in 183 I.C.C. 165.

6b. The statute and the Commission's opinion use the word "assent", not "vote". They mean the same thing.

7. The President of Western Maryland testified in effect that no equity financing was contemplated.

The Examiner, who took testimony and reported on the Plan, held in effect that the Commission did not have jurisdiction to consider the Plan under § 20b of the Interstate Commerce Act, because the defendant railroad had not shown that the proposed alteration and modification was within the purposes of § 20b or met the requirements of said section. The Examiner's report (January 21, 1954) held that the railroad was in good financial condition; that it was able to meet its current obligations and all debt and dividend charges; that it had been able to pay the dividends on the first preferred stock as they accrued since 1939 and had even reduced the old accruals by a total of $14 a share through payments on account made in 1951 and 1952, so that the old accruals amounted to $126 per share, covering about eighteen years at the rate of $7 a share, when the Plan was filed April 1, 1953.

The Examiner's report came on before Division 4 of the I.C.C. and that Division reversed the Examiner on October 14, 1954 by a vote of 2 to 1, and approved the Plan filed by Western Maryland, with minor modifications. Commissioner Mahaffie dissented. (290 I.C.C. 445) On reconsideration before the full Commission, the report of Division 4 was in effect upheld on February 21, 1955.

\* \* \* \* \*

In the present action the plaintiffs contend (1) that Western Maryland did not establish the existence of the conditions prerequisite to the exercise by the Commission of its powers under § 20(b) to reorganize the Railroad's capital equity structure; (2) that Baltimore & Ohio did not have the right to vote its stock holdings in favor of the Plan; and (3) that the Plan is inequitable and unjust and should not be imposed on plaintiffs as the holders of 2760 shares of Western Maryland first preferred stock without their consent.

The I.C.C. and the Baltimore & Ohio have intervened as defendants in this action. 28 U.S.C. § 2323. The United States of America is a party defendant as required by 28 U.S.C. §§ 2321 and 2322.

The answer filed by the United States and the brief submitted by the Attorney General have confessed error in this case. The Attorney General contends that the proposed stock modification plan does not come within the scope of § 20b of the Interstate Commerce Act, as set forth in the Preamble to the 1948 statute of which it is a part, and that the action of the Commission was not exercised under circumstances described in and for the purposes set forth in the said Preamble of the statute, § 1 of 62 Stat. 163. The Attorney General also contends that the statutory requirement that at least 75% of the outstanding stock of each class be voted in favor of the stock modification plan was not met in this case because the Baltimore & Ohio stockholdings, which had been trusteed to the Chase National Bank, should not have been considered as having voted for the Plan. The Attorney General does not discuss the merits of the Plan.

The brief of the Commission argues that plaintiffs misconceive the purpose of Section 20b; that the proposed Plan is in the public interest, is in the interest of Western Maryland Railway, and to the best interest of each class of stockholders of Western Maryland; that the Baltimore & Ohio had the right to vote its trusteed stock in favor of the Plan; and that the Commission's action did not deprive plaintiffs of any rights as owners of the present first preferred stock without "due process".

The brief of the Baltimore & Ohio deals with the right of that railroad to accept or reject the Western Maryland Plan.

The brief of Western Maryland makes the same contentions as the Commission and the Baltimore & Ohio in support of the Plan.

\* \* \* \* \*

■■ The first question to be considered is whether the requisite conditions were established to give the Com-

mission jurisdiction to pass upon the merits of the Plan. The Commission, as a quasi judicial body, would have the power to inquire and ascertain whether facts and circumstances existed which established that the Commission had jurisdiction to consider the Plan. The Commission's findings that certain facts were established which gave it such jurisdiction are subject to court review.

The jurisdiction conferred on the Commission to pass upon the merits of a plan submitted by a carrier to revise its capital structure, despite the provisions of the carrier's charter and the provisions of the equity securities issued thereunder, can be exercised only if a situation is presented which requires action by the Commission under § 20b. Commissioner Mahaffie, who was the father of § 20b, in his dissent to the report of Division 4 on the Western Maryland plan, stated:

> "The provisions of section 20b, under which we are called upon to set aside and nullify provisions of valid existing contracts, are not to be lightly invoked; and a plan for the alteration of a carrier's securities should be approved only where a clear showing has been made that the paramount public interest will be so promoted as to justify overriding the objections of dissenting security holders. No such showing has been made in this case". (App. 123.)

■ "Questions affecting constitutional power, statutory authority" can be raised on a resort to the courts to review an order of the Commission. Rochester Telephone Corp. v. United States, 307 U.S. 125, 140, 59 S.Ct. 754, 83 L.Ed. 1147. These are legal questions, which do not involve any invasion of the Commission's exclusive jurisdiction over matters "which call for technical knowledge pertaining to transportation", Rochester Telephone Corp v. United States, supra, 307 U.S. at page 139, 59 S.Ct. at page 761, in which they are most expert. The main question here presented is whether the Commission acted within its statutory authority. To determine that question calls for a construction of § 20b, in particular the Preamble of the statute of which it was a part.

The Commission contends that it did not have to be shown, before it could act on the plan, that the Western Maryland Railway had present or anticipated financial difficulties, as the plaintiffs argue. The Commission asserts that plaintiffs' contention completely overlooks one of the stated purposes of Section 20b, "to enhance the marketability of railroad securities impaired by large and continuing accumulations of interest on income bonds and dividends on preferred stock"—using the language of the Preamble of the statute. The following quotation from the Commission's brief states the Commission's position on this point, involving its jurisdiction over the plan under § 20b:

> "The Commission specifically found (461), and it cannot be disputed, that Western Maryland had a large ($126 per share) and continuing (18-year) accumulation of dividends on its first-preferred stock, that it would require a minimum of 10 years under favorable conditions, and possibly 18 or more years, for the carrier to liquidate the dividends thus accumulated, and that modification of the securities would enhance the marketability of the carrier's stock and would promote the public interest in increased stability of values of railroad securities, with resulting greater confidence therein of investors. Under those circumstances there was no necessity, under the statute or otherwise, for a showing or a finding that the carrier was in either 'present or anticipated financial difficulties.' "

■ The above quoted paragraph discloses what appears to be the basic error of the Commission's conclusion that it had jurisdiction over the Plan. It found that there was a *"continuing accumulation"* of dividends on Western Maryland's first preferred stock. The fact is that no dividends have accumu-

lated thereon since 1939 at which time the accumulations amounted to $140; that in each of the years 1951 and 1952 the Railroad paid off $7 on account of the dividends which had accumulated prior to 1940, reducing the total old accumulation to $126 per share. The findings of the Commission that there was a "continuing accumulation" of dividends on Western Maryland's first preferred is refuted by the undisputed facts.

The Commission interprets the words "large and continuing accumulations" as used in § 20b as meaning "a large accumulation" that "will continue for a long period", according to the majority opinion in 290 I.C.C. 445. That interpretation adds words to the language of the Preamble that were not used by the Congress and disregards the clear meaning of the participial adjective "continuing" in relation to its noun "accumulations". The words "continuing accumulations" mean presently continuing to accumulate, an ever growing accumulation. In addition to showing that the old accumulations were "large" it had to be shown also that they were being added to.

The dividend arrearages on Western Maryland's first preferred stock are not increasing and the immediate prospects are that the old arrearages will be paid off within a reasonable time and will not remain indefinitely as a blight upon the corporation, adversely affecting the corporation, its stockholders, and the public.[8]

The net earnings of the Railroad have increased steadily in recent years. Its net earning for the ten years of 1943–1952 were about $47,000,000 compared with about $17,000,000 for the period of 1933–1942. For every year since 1936, except 1938, its net earnings have exceeded its first-preferred dividends. They averaged $30.21 per share for the period of 1948 to 1952. In 1952 they were $32.41 per share.[9] On December 12, 1953, the Railroad authorized payment of $10 on its first-preferred subject to approval of the Plan, and if not approved the $10 was to be applied to reduction of arrearages.

The road's net income and the manner in which it was employed from 1923 to 1952 is shown by the following figures:—

| Period | Net Income | Plowed Back | First Preferred Dividends |
|---|---|---|---|
| 1923–32 | $19,436,679 | $19,436,679 | None |
| 1933–42 | 17,282,160 | 11,072,460 | $ 6,209,700 |
| 1943–52 | 47,134,802 | 32,231,522 | 14,903,280 |
| | $83,853,041 | $62,740,661 | $21,112,980 |

In all the years from 1923 to 1952 Western Maryland paid out only about 25% of its net income in dividends. During that time it paid no dividends on its second preferred stock or on its common stock. Class I railroads between 1920 and 1950 plowed back less than 40% of their net earnings. The Pennsylvania paid one dollar in dividends for each dollar expended on its properties. The accruals of unpaid dividends on Western Maryland's first preferred stock would

8. Indeed this distinction has been invoked by the Commission itself. In Maine Central RR Securities Modification, 275 I.C.C. 261, a plan was rejected as being outside the scope of § 20(b) where the prospects for reasonably prompt removal of arrearages were good. But in Boston & Maine R. Securities Modification, 275 I.C.C. 397, affirmed Sakis v. United States, D.C., 103 F.Supp. 292, 304, where arrearages could be expected to last for 74 years, and further accumulations could be expected for 17 years, a modification plan was approved. In the case of Western Maryland, the Commission found that the arrearages might be paid off in 10 to 18 years.

The appeal in the Sakis case was dismissed on stipulation. 344 U.S. 801, 73 S.Ct. 4, 97 L.Ed. 625.

9. The net income of Western Maryland for the years 1949–1954 inclusive was:—1949—$4,044,777; 1950—$5,368,368; 1951—$5,537,026; 1952—$5,750,070; 1953—$7,674,025; 1954—$7,225,463.

In 1954 the gross revenue fell off. It was about $41,000,000 compared with about $42,000,000 for the year 1950, $48,000,000 for the years 1951 and 1952 and $51,000,000 for the year 1953. The years 1950 to 1953 included the Korean War period.

now be very small, if Western Maryland had plowed back 50% of its net income instead of 75%.

The interest of the traveling and shipping public who use the Railroad (Western Maryland) should of course be considered in passing upon a Plan to modify its capital structure. That public interest is (as the Preamble of the statute states) "in avoiding the deterioration of service and the interruption of employment which inevitably attend the threat of financial difficulties and which follow upon financial collapse". The Western Maryland Railroad has comparatively little passenger traffic. The major part of its revenue is from carrying freight in bulk, principally coal and coke. There has been no deterioration in its service and no interruption of employment. The physical condition of the railroad and its equipment is good. A general description of Western Maryland's trackage, terminal, equipment and freight is set forth in the Examiner's Report, Exhibit B annexed to the complaint.[10] All that has been done to increase the earning power of Western Maryland by plowing back 75% of its net earnings has made the prospect of any financial difficulties most remote.

The Commission (Division 4) found "that modification of its securities as proposed will enhance the marketability of applicant's stock and will promote the public interest in increased stability of railroad securities, with resulting greater confidence therein of investors". The Preamble to Section 20b, Section 1 of the Act of April 9, 1948—62 Stat. 162, declares that the section was in aid of the national transportation policy of the Congress as set forth in the Preamble of the Interstate Com-

---

10. "Applicant is a consolidated railroad corporation organized under the laws of Maryland and Pennsylvania. The agreement of consolidation, dated January 23, 1917, forms its corporate charter. Applicant operates as a common carrier in those two States and in West Virginia and as of December 31, 1952, it operated over 831.41 miles of lines, including 530.52 miles of owned main lines, 135.90 miles of owned branch lines, and 164.99 miles of main lines owned by other carriers. Applicant's lines radiate from Baltimore, Md., extending northwesterly to Connellsville, Pa., and southwesterly to Webster Springs, W. Va. The main traffic route is between Connellsville and Shippensburg, Pa., via Cumberland and Hagerstown, Md. Substantial overhead traffic obtained from the Baltimore & Ohio at Cherry Run, W. Va., moves via applicant's lines to Shippensburg and thence over the lines of the Reading Company and other connections to Philadelphia, Pa., New York, N. Y., and New England. Westward from Connellsville traffic over applicant's lines reaches Pittsburgh, Pa., Cleveland, Ohio, Chicago, Ill. and the middle West, via connections with The Pittsburgh & West Virginia Railway Company, The Pittsburgh and Lake Erie Railroad Company, and other connecting lines.

Coal traffic in large volume is originated on detached lines in the Fairmont Region of West Virginia and the Somerset Region of Pennsylvania, both regions being served by applicant under trackage rights over the lines of The Baltimore & Ohio. Applicant's lines into West Virginia serve the West Virginia and Elk River Coal regions and west of Cumberland its lines reach the Cumberland-Piedmont region. Applicant operates a modern and extensive tidewater terminal covering about 185 acres at Port Covington on Baltimore Harbor, with docking facilities for 20 oceangoing vessels at one time. The facilities owned by applicant include a 4-million bushel grain elevator, a large coal pier equipped with 2 coal dumpers, a 1,500-foot ore pier on which 2 high-speed cranes are in operation, and a covered merchandise pier; all supported by a radio-controlled yard having a capacity of 2,300 cars. Applicant holds, under long-term lease from the City of Baltimore, warehouses and three extensive covered merchandise piers equipped with modern facilities for transferring cargoes between ships and railroad cars, and with facilities to accommodate additional motor-truck traffic.

At December 31, 1952, applicant's owned or leased equipment included 132 steam and 83 diesel locomotives and 13,195 freight cars. Ten new diesel units were delivered in May 1953 and 450 freight cars in midsummer of 1953; and 500 freight cars are on order for delivery early in 1954. About 65 percent of applicant's freight and passenger services and 98 percent of its yard operations are dieselized."

merce Act.[11] It is not at all clear that the Plan of Western Maryland will enhance the marketability of its stock, as Commissioner Mahaffie points out in his dissent, or that it will increase the stability of its stock. The promotion of any public interest in the increased stability of railroad securities generally or the alleged resulting greater confidence of investors in railroad securities, would not justify any alteration and modification of the equity securities of a financially sound, efficiently equipped and well operated railroad, such as Western Maryland, where it is not shown that there is any need for the alteration and modification.[12] It would not be a constitutional exercise of power under the Interstate Commerce Act and would be in violation of the "due process" provision of the Fifth Amendment for the Commission to approve a Plan which as the Commission states in its opinion, has as its "primary objective * * * the elimination of the dividend arrearage on its first-preferred stock, thereby making a declaration of immediate dividends on its second preferred and common stock possible", just to promote the interest of the public or of investors generally in the stability or enhanced value, of railroad stock.

The origin of the present $17,760,400 par value of first-preferred stock, except for $20,900,[13] were debt obligations of members of a railroad system consolidated in 1917 into Western Maryland. The present second-preferred stock and common stock represent only preferred and common stock interests in the railroads that were then consolidated as Western Maryland. That accounts for the special priority and cumulative provisions as to dividends, which the present first-preferred stock received under the consolidation agreement. As former creditors they were entitled to it.

Section 20b is known as the Mahaffie Act. It was adopted in 1948, 62 Stat. 163, as an amendment to the Interstate Commerce Act. It was believed that it would afford a "more simple, less expensive and expeditious method of effectuating modification of the financial structures of railroad corporations" (Senate Report No. 897—80th Cong.2d Sess.1948). The Managers on the part of the House, in Conference Report No. 1603, stated that the purpose of the amendment (§ 20b) was "to aid in assuring the continuity of sound financial condition of railroads by enabling them, so far as possible, to avoid prospective financial difficulties, inability to meet

11. Act of Sept. 18, 1940, c. 722, Title 1, § 1, 54 Stat. 899, declared the National Transportation Policy as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water,

highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered or enforced with a view to carrying out the above declaration of policy."

12. The three-judge court in Sakis v. United States, 103 F.Supp. 292, at page 301 held: "It is not the understanding of the Court that the Commission must find that the plan is *necessary*, but rather that it is in the best interest of the carrier and the public". We are of the opinion that some present need for the plan must be shown.

13. The present first-preferred was issued for (a) $10,000,000 face amount of 5 percent collateral trust notes; (b) $6,-000,000 face amount of 6 percent unsecured notes; and (c) $1,739,500 par value for defaulted interest on said notes.

debts as they mature, and insolvency". [See also an article by Stephen W. Tulin on "The Full Compensation Doctrine in Corporation Reorganization" in the Yale Law Journal, Vol. 63, Number 6, p. 812 at p. 835, April 1954.]

In his dissenting opinion on the Western Maryland Plan, Commissioner Mahaffie stated:

"Applicant is not faced with any prospective financial difficulties, and the favorable terms upon which it recently has been able to market its securities do not indicate that the arrearages on its preferred stock has affected its credit substantially. Applicant has no plans for, and there is no prospect of any early equity financing, * * *. [Its president so testified.] The annual dividend requirement on the new preferred stocks will greatly exceed such requirement on its presently outstanding preferred stocks. If full dividends on the new preferred stock are earned and paid every year, with enough earnings over to make the new preferred stock sinking fund payments, it would take 100 years, through operation of the sinking fund, to reduce the annual preferred stock dividend requirements to the annual requirements of the present preferred stocks. In my opinion, the proposed increase in preferential stock will detract from, rather than enhance, applicant's ability in the future to resort to equity financing if conditions should make such financing feasible and desirable. Nor am I convinced of the soundness of the finding that under the plan now approved holders of the applicant's first preferred stock will receive securities 'at least equal' to the value of those surrendered. They now have priority as to any earnings distributed. This plan dilutes that priority."

▮ The Commission's ruling that the requisite facts had been established to give it jurisdiction to pass upon the merits of the Plan and that the Plan came within the scope and purposes of § 20b was erroneous.

\* \* \* \* \*

There remains the question involving the right of the Baltimore & Ohio to vote its holdings of Western Maryland stock in favor of the Plan. The stock is registered in the name of the Baltimore & Ohio. It was trusteed to comply with an order of the Commission, dated January 13, 1930, requiring B & O to divest itself of control of Western Maryland. The Commission passed upon the trust agreement in 1932 and apparently it was satisfied that its terms would prevent the Baltimore & Ohio from exercising control over the operations of a competing line, the Western Maryland. Under the trust agreement the Baltimore & Ohio reserved the right to sell its stock interest. The right to assent to the plan of alteration and modification of Western Maryland's outstanding preferred and common stock, was an incident of the Baltimore & Ohio's beneficial ownership of the stock, which had nothing to do with control of Western Maryland by B & O. The stock to be issued under the Plan would be subject to the restrictions of the trust agreement. The B & O stock ownership in Western Maryland was not barred from assenting by the provisions of § 20b(3) of T. 49 U.S.C. Chase, as trustee of the B & O stock, did not and could not assent to the Plan. B & O, as the beneficial owner of the stock, could and did.

▮ The Commission's reason for requiring B & O to deposit its stock under the trust agreement, was that thereby the B & O would cease to control the Western Maryland, since that control (absent Commission approval) was unlawful. See I. C. C. v. B & O, 160 I.C.C. 785 and 183 I.C.C. 165, cf. Alleghany Corp. v. James Foundation, 2 Cir., 214 F.2d 446. If the trust agreement had reserved in B & O the power to consent to such a Plan, it still would not have left the B & O with any vestige of control over Western Maryland. Had the B & O asked the Commission to allow the trust agreement to be amended to in-

clude such a reservation, no doubt the Commission would have granted the request. See, e. g., the reservations in the trust agreement, re the stock of Western Pacific, found in the record in Alleghany v. James Foundation, 2 Cir., 214 F.2d 446. The majority of the Commission, in the instant case, in effect interpreted the trust agreement as impliedly including the necessary reservation. The Commission's interpretation of the purpose, scope and meaning of the trust agreement, and of the rights the Baltimore & Ohio retained in its Western Maryland stock under the terms of the trust agreement, should carry great weight with this Court.

The Commission's ruling that the Baltimore & Ohio, as the beneficial owner of its stock in Western Maryland, had the right to assent to the Plan submitted by Western Maryland, and that the requisite 75% of the stock of all classes of stock assented to the Plan was correct.

\* \* \* \* \*

The plaintiffs are entitled to a decree setting aside the order of Division 4 of the Interstate Commerce Commission, dated October 14, 1954, and enjoining the Commission from giving effect to its said order approving the Plan of Western Maryland, dated April 1, 1953, to alter and modify its capital stock structure.

WEINFELD, District Judge (concurring).

I concur in the Court's primary holding annulling the Commission's order on the ground of lack of jurisdiction since upon the undisputed facts and the findings the proposed plan was beyond the scope of Section 20b. However, I dissent from my colleagues' further holding that the Commission was correct in its ruling that (1) the B & O as the beneficial owner of the trusteed stock retained the right to vote the shares in favor of the plan and (2) all the stock should be deemed "outstanding" for the purposes of Section 20b(3).

The language of the Trust Indenture is clear and unambiguous. It provides: "The Trustee will exercise the voting power of the Western Maryland Railway stock and will exercise its best judgment from time to time to select suitable directors to the end that the affairs of the Western Maryland Railway Company shall be properly managed, and in voting and in acting on other matters which may come before it as stockholders or at any meeting of the stockholders will exercise like judgment." (Emphasis supplied.)

The Commission's holding that the trust agreement does not entitle the Chase National Bank to assent the stock in connection with a modification proposal disregards this plain language of the indenture. No reservation of voting power in favor of the B & O, whether to assent the stock to a modification plan or for any other purpose, is contained in the trust agreement.

The argument that the proxy given by the B & O to Chase as trustee limits the latter to voting the stock "at meetings of the stockholders of said Western Maryland Railway Company" is unpersuasive. It is the Trust Indenture and not the proxy which defines the relationship of the parties and the power granted to, or withheld from, the trustee. The proxy was delivered under the terms of the Trust Indenture to enable "the Trustee to vote said shares" and to perform its functions in accordance with the power conferred upon it by the indenture and the proxy may not be seized upon to limit that power. Thus it seems to me that the unrestricted grant of voting power to Chase and the lack of reservation in B & O indicates that Chase's right to vote the stock is not limited, as the Commission found, to action to be taken at stockholders meetings but extends to every action which stockholders themselves might take. Under this circumstance, the finding by the Commission that the applicant railroad is controlled by the Chase National Bank by virtue of the trust, necessarily required

a determination that the trusteed stock should not be deemed "outstanding" under Section 20b(3) which in pertinent part states: "For the purposes of this section a security or an evidence of indebtedness shall not be deemed to be outstanding if in the determination of the Commission the assent of the holder thereof to any proposed alteration or modification is within the control of the carrier or of any person or persons controlling the carrier."

The further contention that the ICC had the power to amend the trust agreement so as to reserve in the B & O the power to vote the stock in connection with any modification plan, and exercised that power here, appears to me to be untenable. In altering its pre-existing order the Commission was bound to grant a full hearing to interested parties, including notice of the nature of the proceedings and an opportunity to be heard.[1] The instant hearing was ordered to consider a proposed securities modification. It was not called to consider a proposed modification or interpretation of a long-standing trust indenture. If the ICC or the B & O wished to amend the indenture, it should have done so in the regular course.

I find no basis for the assumption by my colleagues that "Had the B & O asked the Commission to allow the trust agreement to be amended to include such a reservation [in B & O to assent to the plan] no doubt the Commission would have granted the request." The specific reservation in the trust agreement also referred to by my colleagues in citing Alleghany v. James Foundation, 2 Cir., 214 F.2d 446, instead of supporting their position suggests that the absence of such a reservation in the instant case indicates lack of power in the B & O to assent the stock.

Finally, the argument that the sole purpose of the trust was to remove managerial control of the applicant from the B & O is not altogether persuasive. The Commission itself took no such position. It stated "One of the primary purposes of the trust, * * * was to remove control of the applicant from the B & O."[2]

---

1. Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129; Jordan v. American Eagle Fire Ins. Co., 83 U.S. App.D.C. 192, 169 F.2d 281.

